153 F.2d 200 (1946)
THE VICTOR.
J. F. CAMPBELL CO.
v.
DICK.
No. 11328.
Circuit Court of Appeals, Fifth Circuit.
January 23, 1946.
R. A. Dowling, of New Orleans, La., for appellants.
M. A. Grace and Edwin H. Grace, both of New Orleans, La., for appellee.
Before HOLMES, McCORD, and LEE, Circuit Judges.
McCORD, Circuit Judge.
J. F. Campbell Company, a partnership, owner of the motor boat Timberline, brought this libel proceeding against C. J. Dick, claimant of the tug Victor, for damages sustained by the Timberline as a result of a collision. The tug Victor came in contact with the lugger Timberline while it was moored to and against the left or east bank of the Intercoastal Canal looking toward Bayou Lafourche. At the time of the collision the tug Victor was towing two barges and was proceeding toward Bayou Lafourche along the canal but was not directly in the main channel, but was moving "more on the left hand side than the other," and on which side the lugger Timberline was moored. One of the barges being towed by the Victor struck or slapped against the Timberline and crushed and broke into its side, and as a result it was injured and almost immediately it sank and became virtually a total loss.
Only two witnesses who saw the collision appear of record, one for the libelant and one for the owner of the tug Victor. The important facts are these: On March 13, 1940, the lugger Timberline was securely moored against the bank of the Intercoastal Canal, being tied both fore and aft against the bank; about the hour of 5 or 5:30 in the afternoon, the day being clear and vision unobstructed, the tug Victor with two steel barges in tow, was proceeding along and in the Intercoastal Canal in the direction of Bayou Lafourche, and as the tug passed the lugger Timberline, she so maneuvered her tow as to cause the last barge to swing over to port and collide with and crush the Timberline, causing it to sink at the point where it was moored.
The lugger Timberline, about nine feet wide and thirty-six feet long, was at the time engaged in supplying draglines with equipment, transporting the men who were at work to and from the work site, and performing any and all duties in the way of supplying material and aid to the employees of J. F. Campbell Company, who were engaged in digging and constructing a drainage canal, the work site being situated *201 several miles from where the lugger Timberline was moored. The Timberline was moored from time to time in front of the house of its captain, who used this place from which to load and unload equipment and land workmen going to and from the work site. At the time of the collision a strong wind was blowing on the canal which caused the barges being towed to drag the bank of the side of the canal on which the lugger was moored. The evidence is without dispute that these barges had been and were dragging the banks for a distance of nearly a mile as it approached a pontoon bridge which crossed the canal. Just prior to the collision another tug towing three barges, and some thirty minutes before the Victor reached the point of the collision, traversed the canal and passed where the lugger Timberline was moored, and when it appeared that it would come in contact with the Timberline, the captain of the lugger shouted to the captain on the tug with the three barges and he so maneuvered his three barges until they passed safely without coming in contact with the lugger.
The captain of the Timberline was the only one that worked on the motor lugger Timberline, and his evidence informs:
"Q. Now as to the tow? Was the tug pushing the tow or carrying the tow? A. It was towing.
"Q. Were the barges behind one another, or how were they? A. It was a square barge, you know, no point to it. Them barges is even square.
"Q. In which direction was the tug Victor and tow proceeding? A. It was going to Bayou Lafourche.
"Q. On which side of the canal was it proceeding? A. Do you mean the tug 
"Q. On which side of the canal? A. Well, it was more on the left hand side than the other side  going to the Bayou Lafourche.
"How far away was the tug Victor and tow from the Timberline when you saw it? A. They was right even.
"Q. Where were the barges in the tow when you saw it? Were they out in the canal or where? A. They just happened to hit the bank a little behind, and then when I saw them there was a man on the last barge, and he was running behind on the barge, but it was too late to holler; I seen that barge was going to hit.
"Q. Were the barges in tow of the tug Victor dragging the left bank of the canal? A. Not to say drag; they hit once in a while, they would hit and go back out and hit again. That's the way they was coming, them barges.
"Q. Did a collision take place between one of those barges and the Timberline? A. Just a large barge that strike, when the barge hit about 100 feet on the bank behind and then came back. The first barge didn't hit him, but the last barge come back and hit him and smashed him. * * *
"Q. On which side of the Timberline did it hit? A. It hit on the right hand side.
"Q. Did you see this? A. Yes, I was coming to the boat.
"Q. What did you do then? A. Then I run to the boat. I see that I couldn't stop the boat. I holler, but the feller keep passing and I passed a rope to keep the Timberline from turning over in the canal.
"Q. What time of day was this, Mr. Cheramie? A. That's around 5 o'clock in the evening.
"Q. Was it daylight at that time? A. Yes, sir.
"Q. How far could you see? A. Oh. you could see just as far as your eye could reach.
"Q. Now, when you ran down to the Timberline, what happened then? A. At that time, I see everything was smashed, I see the water and everything was busted on the side, and I called back to the guy that run the tug, and we went and seen the tug Victor to be sure to get the right name of the tug.
"Q. Did you see any damage that was done to the Timberline? * * * A. I seen all the ribs was broken on the side, I seen the water just poured in.
"Q. On which side were the ribs broken? A. Well, the mould rib was broke on the right hand side. Of course, the both sides was broke, because the other one smashed against the end of the bank, too, but the worse damage was on the outside.
"Q. Did the Timberline sink? A. Well, it didn't stay five minutes up after the barge strike it. * * *
"Q. Did the tug Victor and tow stop after it hit the Timberline? A. No, they kept going.
*202 "Q. Did you do anything to try to make the tug Victor stop? A. Well, I just run, and the fellow that was on the boat, I hollered at him, but he kept passing the bridge, and he just turned and kept on. There was no chance to stop it then.
"Q. I believe you testified that you went after the boat and saw the name of the boat? A. Yes.
"Q. And what was the name of the tug? A. It was the tug Victor. * * *
"Q. How far is that pontoon bridge from the point where the Timberline was tied up when it sank? A. Well, I imagine it was about 900 to 1000 feet."
On cross examination the witness further testified:
"Q. In other words, you know that it wouldn't be proper to tie a boat up in the Intercoastal Canal in front of your house, don't you? A. Not to leave it there, no.
"Q. You know you shouldn't leave it there? A. Yes, I know if I leave it there, I wouldn't have no boat. * * *
"Q. Now on account of the tows and things, you wouldn't leave the Timberline there either, would you? A. No, if I would leave it there all the time, it would be found to be broken. It just happened when I got back, I happened to come to the landing.
"Q. And it is a fact, isn't it, that even before the tug Victor came by that on other days  for instance, there are tugs and tows that would pass by and rub against the Timberline which would be stopped there to take on men or leave them off? A. I know that when the wind was blowing on the other side, but right before that I hollered at them fellows, come captain. They can take care of that if you land there, so they just let the barge drag into it, but if you just make your barge hit, you bound to break everything that you hit on it."
No notice was ever received from the Engineer's office warning libelant or his employes not to moor his vessel at the place where it was injured until after the collision.
We are unable to agree with the opinion of the learned trial judge wherein he makes the case of The Pennsylvania 86 U.S. 125, 22 L.Ed. 148, the law of the case. That was a case where one of the ships in the collision was sounding a bell instead of blowing a fog horn, as the law directed. Moreover, the decision finally divided the damages equally between the two vessels.
We are of opinion that the law more nearly applicable to this case is that:
"* * * if a ship at anchor and one in motion come into collision, the presumption is that it is the fault of the ship in motion, unless the anchored vessel was where she should not have been. * * * Undoubtedly if a vessel anchors in an improper place she must take the consequences of her own improper act. * * * But whether she is in a proper place or not and whether properly or improperly anchored, the other vessel must avoid her if it be reasonably practicable and consistent with her own safety." The Clara (The Clarita) 90 U.S. 1, 14, 23 L.Ed. 146, 148, 150.
The captain of the lugger Timberline admitted frankly that it was improper and dangerous to moor a vessel where it was injured. However, he did not keep it so moored for any great length of time, and when so anchored where it was stricken it was always securely fastened close to the bank of the canal.
Let us here concede that the lugger Timberline was moored at an improper place, and while the law seems to be well settled that the coming into collision of a moving vessel with an anchored vessel makes out a prima facie case of negligence against the moving vessel, let us further assume and concede that the burden here rests upon the libelant from the beginning to the end of the suit. This must not and cannot exculpate the tug Victor of any contributory negligence, if any there was on her part, in causing the collision.
It was a clear day, nothing obstructed the vision of the mate who was in charge of the Victor. According to his own evidence he could see the Timberline, and he knew his two barges were so loosely tied and so lengthened behind his tug until they fell down against the bank of the canal and they were bumping and slapping the side on which the lugger was moored for nearly a mile before the collision. He further testified:
"Q. Is it a practice to anchor motor vessels in the canal where the Timberline was anchored? In your trips past there before have you seen any anchored there? A. Yes, sir, there have been boats tied there for the last two or three years in the same spot."
*203 The tug which had just preceded the Victor was towing three steel barges, the same size and exactly like the two barges being towed by the Victor, and each of the barges was empty, carrying no load. The important fact is that this tug with the three barges was able in the same wind, at exactly the same place to so maneuver his tug as to pass the Timberline without injuring it. The captain of the Timberline testified:
"Q. When this tug with the three barges in tow drifted alongside the Timberline, did you hear any scraping noise? A. No, sir, he didn't do no damage; he didn't scrape; he just drifted along. Maybe by hollering at the captain, he kicked back and pulled his barge out a little and drifted along."
The mate of the Victor in his evidence made this explanation of the collision:
"Q. How long had the deck hand been out on the barges before you slowed down? A. Well, I had just sent him out there before I got to the half mile sign. He had only been out there about twenty minutes.
"Q. You sent him out there because you knew you were going to pass the motor vessel? A. Yes, sir.
"Q. Was it good daylight at the time this accident happened? A. Yes, sir.
"Q. Did you make any effort to get fenders between the barge and the motor vessel as you passed? A. Well, I really don't know whether he did or not. I sent him back there to watch the barges when they rubbed by. * * *
"Q. Which barge actually came into contact with the motor vessel? A. I really do not know which one it was. We have two new steel barges.
"Q. You don't know which one you had astern? A. No, sir, I really do not know."
The captain of the Timberline had worked as a deck hand in and along this canal all the way from Texas and for a long time. He was familiar with the canal. He testified,
"Q. Was it possible for the tug Victor and tow to have proceeded out in the channel and not come into contact with the Timberline? A. Yes, sir."
When we measure the evidence to the applicable law, it preponderates to show that the mate of the tug Victor was not only guilty of negligence in such sort as proximately contributed to the injury and destruction of the lugger Timberline, but such negligence was almost wholly the cause of the collision. The J. L. Miner, 6 Cir., 260 F. 901; The Europe, D.C., 175 F. 596; The Waterford, 2 Cir., 6 F.2d 980; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943; Lie v. San Francisco, 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726, 727; The Clara (The Clarita), 90 U.S. 1, 23 L.Ed. 146, 148.
From what we have said it results that the decree of the lower court is reversed and the cause is remanded with direction that upon another trial the damages suffered by the Timberline shall be divided equally between the libelant and C. J. Dick, claimant of the tug Victor.
Reversed and remanded with directions.
HOLMES, Circuit Judge (dissenting).
I agree with the court below; see The Victor, D.C., 58 F.Supp. 928. The burden was upon the libellants to prove the alleged negligence of the Victor by a preponderance of the evidence. When it appeared that the Timberline, while moored to the bank, was struck by a moving barge, which was being towed by the Victor, a presumption of negligence arose against the tug. This created a prima facie case in favor of the libellants, which rested upon a rebuttable presumption.
It thereupon became the duty of the respondent (appellee here) to go forward with the evidence, which it did by proving that the launch was moored in an unsafe place in violation of rules and regulations having the force and effect of law. Thus the presumption against the tug disappeared altogether from the case, and the burden of proof remained upon the libellants to prove their allegations of negligence.
The owners of the Timberline did not have a permit to use a portion of the fairway as a mooring place. How dangerous was that place clearly appears from the testimony of the witness Cheramie, who said that if he had left the boat there all the time, "it would be bound to be broken." This witness, who was in charge of the launch, would not even remain on it when the tugs and tows were passing.
"Q. And you would tie that boat up in front of your house whenever you were not using it, wouldn't you? A. Well, I come there when I want to land, but I *204 don't leave it there, because you can't leave that boat there with all them tows. If I would leave it there, I would have no boat a long time ago. I have to put them in the canal outside of the Intercoastal Canal. * * * A. Yes, I know if I leave it there, I wouldn't have no boat."
In The Oregon, 158 U.S. 186, 197, 15 S. Ct. 804, 39 L.Ed. 943, the court speaks of shifting the burden of proof; but, as the court was dealing with disputable presumptions, it is clear that only the burden of going forward with the evidence was meant. It is never the function of a rebuttable presumption to shift the burden of proof. Mobile J. & K. C. R. Co. v. Turnipseed, 219 U.S. 35, 43, 31 S.Ct. 136, 55 L.Ed. 78, 32 L.R.A.,N.S., 226, Ann.Cas. 1912A, 463. For the difference between a disputable presumption, which creates a mere prima facie case, and a presumption that is given the effect of evidence after testimony rebutting it has been introduced, see Western & A. R. R. Co. v. Henderson, 279 U.S. 639, 49 S.Ct. 445, 73 L.Ed. 884.
The law as to the burden of proof is a matter of substance,[1] and the substantive law of a case does not change as the trial proceeds. A rule of evidence may supply an inference of fact, but if that inference is rebutted, it disappears entirely from the case.
The same state of facts may give rise to two conflicting presumptions, the weaker of which must give way.[2] The Pennsylvania case[3] announces a practical presumption, which is often spoken of as the statutory-fault presumption.[4] This is a rule of reasoning by the courts as to causation.[5] Under it, if there was a violation of some statute that the courts deem to be a safety statute which might be causally connected with the collision, the courts will presume that such violation was the cause of the collision, unless the offender proves not only that it was not but that it could not have been.
This doctrine emphasizes the fact that the burden of proof on the trial below was not shifted to the appellee, and that the burden rested upon the Timberline of showing, not merely that her fault probably was not one of the causes, but that it could not have been. It is strengthened by The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84, which holds that it is not enough for the injured vessel to raise a doubt with regard to the management of the other vessel, and that any reasonable doubt on the subject should be resolved in its favor.[6]
Finally, let us run the gamut of this case. At its inception the burden of proof was upon the appellants. This was temporarily met by evidence that the collision was between a moving vessel and one tied to the bank; but the presumption thereby created was quickly dissipated. It died almost at birth when the statutory fault of the Timberline appeared. Thereupon a practical presumption arose that enhanced the latter's burden, beyond a mere preponderance of evidence, so that it was required to prove that its fault could not have caused the injury.
With nine acts of negligence specifically alleged against the Victor, not one of them was proven by competent evidence. The favorite in the brief and argument seems to be that the barges were loosely tied and "swinging in the breeze." No witness testified to this, and not even the length of the hawsers was shown. The deckhand, who probably saw exactly what happened, was not called as a witness. That it was possible for the Victor to avoid a collision is inferred by the success of the preceding tug, but the possibility of the feat was not the measure of its duty. The canal was built for navigation, and tugs are not required to navigate it at their peril. Moreover, the wind may have been different. The absence of evidence on this subject favors the party who does not bear the burden of proof.
NOTES
[1] Central Vermont R. v. White, 238 U. S. 507, 35 S.Ct. 865, 59 L.Ed. 1433, Ann. Cas.1916B, 252; New Orleans & N. E. R. Co. v. Harris, 247 U.S. 367, 38 S.Ct. 535, 62 L.Ed. 1167.
[2] 20 Am.Jur., Sec. 163.
[3] 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148.
[4] This should not be confused with a statutory presumption, contrary to which no proofs may be received. Benedict on Admiralty, Vol. 4, Sec. 620, p. 264 (6th Edition).
[5] Benedict on Admiralty, Vol. 4, p. 267 (6th Edition).
[6] General Seafoods Corporation v. J. S. Packard Dredging Co., 1 Cir., 120 F.2d 117.