**COYLE LINES, Inc. v. UNITED STATES.**

**No. 1290 Admiralty.**

United States District Court,
E. D. Louisiana, New Orleans Division.

April 25, 1951.

Lemle & Kelleher, New Orleans, La., for libellant.

Amos L. Ponder, Jr., Asst. U. S. Atty., Joseph V. Ferguson II, New Orleans, La., for respondent.

WRIGHT, District Judge.

Findings of Fact and Conclusions of Law.

This libel was filed by Coyle Lines, Incorporated, owner of the Barge DB-1845 against the United States of America, the owner of the S. S. Douglas Victory, to recover damages resulting to the barge from a collision between the vessels which occurred in the harbor of Mobile, Alabama, at approximately 8:04 P. M. on Sunday, May 11, 1947. At the time of the collision the S. S. Douglas Victory was in the merchant service and was being husbanded by Luckenbach Steamship Company.

### Findings of Fact.

1. Shortly after 8 o'clock on the night of the 11th of May, 1947, a dumb steel cargo barge, DB-1845, owned and operated by Coyle Lines, Incorporated, then light, afloat in the Mobile River at Mobile, Alabama, and moored to the river (east) end of Pier A, was struck on her outboard side approximately amidship by the Steamship Douglas Victory, owned by the United States of America and operated as a merchant ship.

2. At Mobile, the Mobile River runs practically north and south, and on the west side of the River, piers have been constructed with slips between the piers. The east or river ends of these slips do not extend beyond the channel line of the Mobile River.

3. The night was dark and clear and a light southerly wind was blowing up the Mobile River and an ebb tide estimated at one-half to one knot per hour was flowing down the river.

4. The S. S. Douglas Victory is a large oceangoing steamship. Just prior to the collision it was moored to the south side of Pier B in the slip between Pier B and the pier immediately south thereof, Pier A.

5. The S. S. Douglas Victory undocked shortly before 8 P. M. and backed out into the Mobile River assisted by a tug. The steamship and tug maneuvered so as to throw the steamship's stern upstream against the current and her bow downstream in order that she could proceed down river. While so engaged her bow struck the outboard side of Barge DB-1845 as the barge lay moored at the river (east) end of Pier A, badly damaging the barge and causing her to sink at her moorings.

6. Barge DB-1845 was a cargo barge constructed of steel, 175 feet long, 26 feet wide, and 11 feet deep. On the top of the barge were covered hatches with coamings approximately 3 feet high, so that from the bottom of the barge to the top of the hatch covers measured approximately 14 feet ½ inch. The barge, when light, drew approximately 2 feet.

7. When the S. S. Douglas Victory departed south Pier B on the evening of May 11, 1947, two oceangoing vessels were anchored on the east side of the Mobile River opposite the slip separating Pier A from Pier B. There was approximately 800 feet of navigable water between the anchored vessels and the river ends of Piers A and B.

8. Two barges, the DB-1845 and a Sherman Barge were moored to the river end of Pier A, the DB-1845 being the lower or downstream barge and the Sherman Barge being the upstream barge. The downstream end of the DB-1845 was within a few feet of the downstream corner of Pier A. The barges were made up end to end, and occupied over 300 feet of the face of Pier A, which pier measures 400 feet from the south to the north corner. A tug, the Mary E, was moored outboard to the Sherman Barge.

9. When the S. S. Douglas Victory left her moorings at south Pier B, the second mate, a lookout and several other members of the crew were on her forecastle head in the bow of the vessel, which forecastle head was approximately 30 feet above the surface of the water. On her stern were the third officer and a watch consisting of four or five men. On the bridge were the pilot, quartermaster, junior third officer, chief officer and master. The bridge was approximately 45 feet above the surface of the water. The navigating lights of the Douglas Victory were burning.

10. The tug Mary E was burning her required lights but there were no lights burning on the DB-1845.

11. The deck of Pier A is 6 feet above the water at mean low tide and at the time in question the tide was .9 feet above mean low water, making the deck of the wharf 5.1 feet above the surface of the water. On Pier A was a warehouse which extended to within a short distance from the end of the wharf. On the face of this warehouse on the river end of the wharf there was a series of electric lights all shaded down so as to light the wharf. These electric lights were burning at the time of the collision.

12. After the Douglas Victory cleared the slip at south Pier B her engine for very short intervals was thrown ahead and astern. She was moving to swing her bow to port and her engine and rudder movements together with those of her assisting tug were coordinated to that end. In executing these movements the vessel had little opportunity to gather appreciable headway or sternway.

13. These maneuvers were required to be conducted in the less than 800 feet of channel space between the vessels at anchor on the east side of the river and the lighted tug Mary E on the west side.

14. At about 8:03 P. M. while the Douglas Victory was maneuvering clear of the lighted tug Mary E and at a time when her engine was going full ahead the unlighted barge DB–1845 was observed ahead and moored to the lower end of Pier A. The Douglas Victory was then less than 100 feet away from the barge and headed in at an angle of approximately 45 degrees. Her engine was put half astern, then full astern, and then emergency full astern. No further orders were issued to the tug which was already engaged in pushing the vessel's stern upriver. At about 8:04½ P. M. the bow of the Douglas Victory struck the side of the DB–1845 approximately amidship and at an angle of about 45 degrees.

15. After the collision the S. S. Douglas Victory immediately maneuvered clear of the barge and continued down the Mobile River to the sea. She did not stand by to ascertain if the barge required assistance or to offer any assistance or to identify herself in any way or to anyone as having been the vessel which was involved in the collision. The S. S. Douglas Victory did not send her aiding tug to the assistance of the barge.

16. Prior to the time of the collision the barge DB–1845 was sound, and in good order and condition. It cost libellant $26,-000. At the time of the collision the market value of similar barges was $50,000 to $55,000. The damaged barge was surveyed and a representative or representatives of the Government attended the survey. Repair specifications were prepared and submitted, without objection, to the Government representatives. Bids were let and the low bid, $21,661.35, was accepted, and repairs were effected accordingly. There was no claim for loss of use and the sum of $21,661.35 represents out of pocket cost to libellant for repairs to the barge. The testimony on quantum of damages is wholly uncontradicted.

Conclusions of Law.

1. The S. S. Douglas Victory was in all respects seaworthy and properly manned. At the time of the collision her officers and crew were at their required stations.

2. The area in which the collision occurred is governed by the provisions of the Pilot Rules for Western Rivers, Section 332.18 of which provides in part as follows: "Lights for rafts and other craft.—All coal boats, trading boats, produce boats, canal boats, oyster boats, fishing boats, and other watercraft, except as hereinafter otherwise provided, navigating any bay, harbor, or river, propelled by hand power, horsepower, or by the current of the river, or which shall be anchored or moored in or near the channel or fairway of any bay, harbor, or river, shall carry one white light forward, not less than 8 feet above the surface of the water."

3. The DB–1845 at the time of the collision was violating the provisions of the above section in that she was anchored in or near the channel of the Mobile River after dark with no lights burning.

4. Under the circumstances before she can be absolved of fault contributing to the cause of the collision it must be shown not only that her fault probably did not

cause the collision, but that it could not have caused the collision. The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148.

5. It has not been shown that the failure of the DB–1845 to comply with the Pilot Rules of Western Rivers could not have been at least a contributing cause of the collision.

6. The S. S. Douglas Victory was maneuvered clear of the lighted tug Mary E and her master and pilot both testified positively that if the DB–1845 had been showing her required light, collision with her also would have been avoided. The fact that shoreside witnesses standing on the wharf testified that they could see the DB–1845 in the shaded lights from the warehouse at the river end of the pier does not necessarily mean that the low black barge was visible in sufficient time to avoid collision to the lookout and second mate in the bow of the Douglas Victory 30 feet above the surface of the water or to the master and pilot on the bridge 45 feet above the surface. In any event, if the DB–1845 had complied with the Pilot Rules, libellant in order to recover for her damages would not be reduced to relying on shaded pier lights or the testimony of shoreside witnesses as to the visibility of the barge.

7. In spite of the failure of libellant to show that the violation of the Pilot Rules by the barge DB–1845 could not have been a contributing cause of the collision, the evidence taken as a whole shows that the S. S. Douglas Victory was being maneuvered in an unseamanlike manner, so close to the river end of Pier A that in all probability she would have struck the wharf after clearing the tug Mary E, if the barge DB–1845 had not been in the way.

8. As the moving vessel the S. S. Douglas Victory is presumed to be at fault, and the Douglas Victory must bear her share of the responsibility for the collision unless the respondent can overcome this presumption by a preponderance of the evidence. The Victor, 5 Cir., 153 F.2d 200. This the respondent has failed to do.

9. Further, the Stand-By Act, 33 U.S.C.A. § 367, provides that a vessel failing to stand by after a collision shall, in the absence of proof to the contrary, be deemed to have caused the collision. This act places on the S. S. Douglas Victory the burden of proving she was not at fault in the collision. This likewise she has failed to do.

10. I find mutual fault.

Let a decree be prepared in accord with these findings.