**COYLE LINES, Inc. v. UNITED STATES.**
**UNITED STATES v. COYLE LINES, Inc.**

No. 13777.

United States Court of Appeals
Fifth Circuit.

April 10, 1952.

Rehearing Denied May 15, 1952.

Selim B. Lemle, New Orleans, La., for appellant.

Joseph V. Ferguson, II, Dist. Counsel, U. S. Maritime Administration, Lansing L. Mitchell, Asst. U. S. Atty., New Orleans, La., for appellee.

Before SIBLEY, RUSSELL, and RIVES, Circuit Judges.

RIVES, Circuit Judge.

Both parties have appealed from a final decree of the district court finding mutual fault on the part of the United States, owner of the Douglas Victory, and Coyle Lines, owner of the barge, D.B. 1845, for a collision which occurred between the vessels in Mobile Harbor on May 11th, 1947, at about 8:00 p.m. The decree awarded Coyle Lines a judgment against the United States in the sum of $10,830.67, together with interest and costs. The opinion of the district court is reported in 96 F.Supp. 821 et seq.

The night was dark and clear. A light southerly wind was blowing up the Mobile river which at this point runs due south and a strong ebb tide was flowing down the river.

The wharves of Alabama State Docks are constructed on the west bank of the river and the piers on which the wharves had been built run in a northwest-south-east direction. Pier A is the lower or more southernmost and Pier B is just north of Pier A. A dredged slip several hundred feet in width separates Pier A from Pier B.

Two barges, the D.B. 1845, here involved, and a Sherman barge were moored to the east or river end of Pier A, the D.B. 1845 being the lower or downstream barge and the Sherman barge being the upstream barge. Both barges were unlighted. A tug, the Mary E, was moored outboard of the Sherman barge.

The Douglas Victory had been moored to the south side of Pier B in the dredged slip between Pier A and Pier B. It was a seagoing merchant vessel of the United States, an old Victory ship 439 feet long.

When the Douglas Victory departed south Pier B on the evening of May 11th, 1947, two vessels were at anchor on the east side of the Mobile river opposite the slip separating Pier A from Pier B. This was not an unusual circumstance and it appears that there was about 800 feet of navigable water between the anchored ves-sels and the river end of Pier A and Pier B.

The description of the accident as contained in the rough bridge log book of the Douglas Victory is here quoted not with the intention of approving all that is said in that description but because it helps to a clear understanding of the case:

"Sunday May 11th 1947.

"Left Dock Pier B. assisted by tug Ernest Ladd. Capt. E. N. Borden Pilot handling ship. Engine—slow astern. Tug Ernest Ladd made fast on Port Quarter to assist ship to turn around. Weather clear but pitch dark. Laid up ships tied up to the east bank astern of the ship. One tug boat and two barges moored outside of Pier A. A strong eb tied was setting down the chanal which made it very difficult to turn the ship up stream and head her down the Chanal also on account of very close Quarters and very difficult in the darkness to judge the distance from the ships tied up at the east bank astern of us. it was necessary to clear a tug boat and two barges which was moored outside at Pier A. We saw the tug which had lites on but no lites were on the barges. Various speeds of the engine were used to turn ship around & head her down the chanal * * * ship's bow struck 2nd barge laying outside Pier A no lights on the barge. We did not see this barge as she laid low in the water below the Pier head. Dont know what damage was done to barge as we could not see account of darkness * * * let go tug * * * ship straitened out and proceeding down the channal on Examination of ship's bow found a small dent above the water line. No other apparent damage to ship * * *".

The district judge found, and with this finding we agree, that the D.B. 1845 at the time of the collision was violating the provisions of Section 332.18 of the Pilot Rules for Western Rivers in that she was moored in or near the channel of the Mobile river after dark with no lights burn-

ing. The presumption follows that such violation of a statutory rule, if not the sole cause, was at least a contributory cause of the collision, and the burden rests upon Coyle Lines of showing not merely that such fault might not have been one of the causes, or that it probably was not, but that it could not have been. It was under that rule, established in the case of The Pennsylvania, 19 Wall. 125, 22 L.Ed. 148, that the district court held that the failure of the D.B. 1845 to carry a light was at least a contributing cause of the collision and found mutual fault. The United States insists that the collision was caused by the sole fault of the D.B. 1845.

The Stand-By Act, 33 U.S.C.A. § 367, provides that a vessel failing to stand by after a collision shall "in the absence of proof to the contrary" be deemed to have caused the collision. The Douglas Victory, after maneuvering herself free of the barge, did not stop to identify herself or to ascertain what damage the barge had sustained, or to offer any assistance, nor did she send her attending tug to the assistance of the barge. The Douglas Victory proceeded on down the Mobile river toward the Gulf of Mexico en route to New Orleans. In addition, the district court found, and with this finding we agree, that "the evidence taken as a whole shows that the S. S. Douglas Victory was being maneuvered in an unseamanlike manner".

In this case we are confronted with conflicting presumptions because of the statutory fault of the D.B.1845 in failing to carry a light as required by the Pilot Rules of Western Rivers, and because of the violation by the Douglas Victory of the Stand-By Act. Coyle Lines claims the benefit against the United States of still further presumptions, viz.: that the moving vessel, the Douglas Victory, is presumed to be at fault, The Victor, 5 Cir., 153 F.2d 200; and that the failure of the United States to produce the Douglas Victory's deck bell book and to produce witnesses with knowledge of the collision raises the inference that their production would disclose information unfavorable to the Government. All of these presump-

tions, in the final analysis, are mere aids to the court in getting at the right of the matter, and their relative weight must depend upon the circumstances of the particular case.

"On an appeal in admiralty the hearing is *de novo*, and it is our duty to review the whole case and make such decree as ought to have been made." Pavlis v. Jackson, 5 Cir., 131 F.2d 362, 363. In this case all of the testimony of the witnesses to the collision was taken by deposition and no opportunity was afforded the district court to see and hear those witnesses. We have no reason therefore to give weight to the district court's findings of fact. Waterman S. S. Corp. v. U. S. S. R. & M. Co., 5 Cir., 155 F.2d 687, 690; The Lapwing, 5 Cir., 150 F.2d 214, 215. A careful consideration of the record leaves us with the conviction that the sole fault for the collision rests on the Douglas Victory.

H. V. Taylor and W. P. Long at the time of the collision were employees of Alabama State Docks. Taylor was Chief of the Police Department of the Docks and had driven up in his automobile just a few minutes before the collision occurred. He testified that there were lights burning across the face of the warehouse on the end of the Pier A, that he could see the barges, and that the light from his automobile was shining on the barges; that the barge which was struck was standing above the deck of the wharf, that the tugboat outside of the barges was lit up, and that from where he was sitting there was sufficient light for him to see the barge which was struck. Long testified that prior to the collision he turned on the lights on the warehouse on the face of the wharf and that there were five lights burning, two in a group on the north end, one a 200 watt and the other a 150 watt, and three in a group on the other end which were either 100 or 150 watt lights. All of the lights were on the river end of the warehouse. They carried shade reflectors which the photographs show were not turned directly downward but would cast part of the beam of the lights beyond the river end of the pier. However, it must be borne in mind that the crew of the Douglas Vic-

tory on the bow of the vessel were approximately 30 feet above the water and that their perspective was not at all the same as that of the witnesses who were on the pier.

The Government called only three witnesses on the actual happening of the collision, all officers of the Douglas Victory: her master Captain Ernest E. Green, her second officer, Donald R. McMunn, and her pilot, Captain N. Borden. Captain Borden testified that the Douglas Victory was scheduled to sail at 7:31 on this Sunday evening, and that a short while before that time he went out to the end of Pier B where the Douglas Victory was lying for the purpose of looking at the vessel's draft and he saw a small tug lighted lying at the north or river end of Pier A and that was the only thing he saw there. McMunn, the second mate, testified that as the Douglas Victory cleared the slip he saw the tug and a barge astern of the tug. The master, Captain Green, testified that he saw the tug but that the first he knew of either barge was when the second mate, McMunn, sang out first that he saw one barge and then that he saw the other.

The pilot, Captain Borden, went on to testify:

> that while they were maneuvering, he "called to the Mate on the forecastlehead, I think it was the Second Mate of the ship up there, and asked him—we were clear, I could see the tug, we were clear of her,—if everything was clear forward. He said there was a barge about 30 or 40 feet ahead of us. Well, our bow was swinging out to the left then, and I reversed the engines—give them full astern instead of half, and at about 8:04½ she hit the barge. There were no lights on the barge; I had no knowledge of the barge being there until the Second Mate told me that she was there."

McMunn, who was the Second Mate on the forecastlehead, testified as follows:

> "Q. And had you seen the barge next to the tug at that time? A. As we cleared the slip I seen a tug and a barge astern of the tug.'

> "Q. What happened after that? A. Well, the ship was swinging to port and being set down at the same time.

> "Q. Set down by what? A. The tide, the ebb tide.

> "Q. Was there a tug assisting? A. There was a tug on the stern. We were being set down all the time and turning to port, and as we set down, I seed another barge.

> "Q. What did you do? A. Called the bridge and let them know about it, and at that time, well, it was dark, it was pretty late then.

> "Q. Pretty late? What do you mean by pretty late? A. Didn't have much time to do anything."

The second mate's testimony would leave the impression that he called the bridge about the D. B. barge but that by that time there was not much time. The pilot on the other hand is definite that he called the second mate to find out if the ship was clear. In another place in his testimony the pilot reiterates that statement:

> "Q. Now, Captain you say the first time that you knew there was a barge was when the Mate sang out to you there was a barge? A. No, he did not sing out. I called to him and asked him how she was forward, if she was clear forward, and he said there was a barge about 30 or 40 feet ahead."

It will be noted that on both statements Captain Borden quoted the second mate as saying that there was a barge about 30 or 40 feet ahead. Actually, as we shall presently show, Captain Borden referred to the distance of 30 or 40 feet a third time. That distance receives strong corroboration from Willie Strickland, the engineer of the moored Tug Mary E, who moved from that tug onto the Sherman barge because he was apprehensive that the Douglas Victory would strike the tug. Mr. Strickland testified in part:

> "Q. Could you see any men on the Douglas Victory? A. I seen four or five up on the bow of the Douglas Victory there.

> "Q. And did you hear any conversation or anything? A. I heard some-

body—I don't know who he was—but he 'hollered' back to somebody, said, 'it's about thirty feet away,' and 'it's about ten feet,' and 'it's just going to hit,' and it was all about that long apart."

Let us contrast this distance of 30 or 40 feet with the testimony of the second mate, Mr. McMunn, on cross-examination as follows:

"Q. How far were you off, approximately, in feet from this barge *when you notified the bridge* that there was a barge ahead? A. I would say *when I noticed it* we were maybe a hundred feet off.

"Q. And moving how at that time? Ahead or astern? A. We were going ahead at the time.

"Q. By 'a hundred feet off' you mean a hundred feet out in the river from the barge? A. We were a hundred, well, I would say we were a hundred feet away from the barge.

"Q. In what direction? A. Whatever angle we were heading, we was away from the barge.

"Q. In other words, your bow, your stem was a hundred feet away from the port side of the barge? A. That is right.

"Q. Or outstream side of the barge? A. That is right." (Emphasis supplied.)

From the testimony last quoted when considered in connection with the other testimony of Mr. McMunn and of Captain Borden we draw the conclusion that Mr. McMunn saw the barge a considerable time before he responded to Captain Borden's query as to whether everything was clear. That conclusion is strengthened by Captain Borden's further testimony:

"Q. Did you have a lookout on the forecastlehead? A. Yes, we did.

"Q. But he did not report to you that there was any barge ahead of you? A. He did not report or call to me. I guess he probably thought I saw the barge too. I saw the tug.

"Q. Never mind what he thought. Lets confine ourselves to what you saw

and what happened. Did the lookout—first of all, who was the lookout on the forecastlehead? A. One of the seamen, I don't know his name now.

"Q. And in addition to that, who else was there on the forecastlehead? A. The second mate was there; the carpenter was there, the boatswain was there, and there was three or four other seamen.

"Q. But none of them told you or reported that there was a barge ahead of you, until you called out and asked if it was clear forward,—that is right? A. That is right.

"Q. And then what was it he told you when you sang out? A. He said there was a barge about thirty feet ahead,—30 or 40 feet ahead."

The conclusion is almost inescapable that the lookout on the forecastlehead and McMunn and probably the other seamen on the forecastlehead saw the barge but failed to report it to the bridge. Captain Borden may have surmised correctly that they thought that it was sufficiently visible to him.

■ The Government did not produce as witnesses the lookout on the forecastlehead, nor any of the other seamen located there who might have seen the barge, nor did the Government make any showing in the testimony that these missing witnesses were not in the employ of the Government or that they were searched for or that they could not be located. The inference is clear that if they had been called their testimony would probably have been unfavorable to the Government. See Chicago & N. W. Ry. Co. v. Kelley, 8 Cir., 84 F.2d 569, 572; The Cananova, D.C., 297 F. 658; The Mincio, 1936 A.M.C.1765, 1771; Equipment Acceptance Corp. v. Arwood Can Mfg. Co., 6 Cir., 117 F.2d 442, 445; The Algie, 2 Cir., 56 F.2d 388, 389; Woods v. Graf, D.C., 84 F.Supp. 893, 895.

We can see no valid reason why the Government did not either take the testimony of the lookout on the forecastlehead or account for his not being available. The observation of the Supreme Court made more than a century ago in Clifton v. Unit-

ed States, 4 How. 242, 247, 11 L.Ed. 957, seems here applicable:

"If the weaker and less satisfactory evidence is given and relied on in support of a fact, when it is apparent to the court and jury that proof of a more direct and explicit character was within the power of the party, the same caution which rejects the secondary evidence will awaken distrust and suspicion of the weaker and less satisfactory."

The inference from the failure of the Government to produce the missing witnesses is particularly strong in this case where there is a proven violation of the Stand-By Act. The testimony of the three witnesses to the collision produced by the Government, somewhat conflicting and unsatisfactory as has been noted, does not constitute the "proof to the contrary" of the Douglas Victory's fault in this case where it appears that the lookout and other members of the crew on the forecastlehead would probably be able to supply direct testimony and the Government has neither produced them nor proved that they were unavailable.

Accordingly we hold that the decree of the district court should be reversed with direction that the United States, as owner of the Douglas Victory, be decreed solely at fault for this collision and condemned to pay to libellant, Coyle Lines, Inc., the full amount of its damages with interest and costs.

Reversed and remanded for further proceedings.

SIBLEY, Circuit Judge (concurring).

Concurring in the judgment and opinion, I wish to state more fully the reasons why I do not think the failure to put a light on the barge caused in any way the injury to it. A marine surveyor, A. A. Grant, inspected the sunken barge two days later, and afterwards superintended its reconstruction, and his evidence, backed by photographs, is that this steel welded barge, 80 feet long and 26 feet beam, was struck nearly amidships, that the ship's stem cut into its side four and a half feet and buckled the bottom entirely across, crushing the other side of the barge against the concrete pier and bending it into a crescent shape. In repairing it a section across the center about 25 feet long had to be removed and built new, the bow and stern ends being then joined to it, at a cost of about $20,000. This witness says: "It was struck head on, as near at right angles as it is possible to do it. * * * Oh, it was not glancing, it was head on. If they had tried to hit it they could not have hit it fairer. * * * It was a heavy blow". The master of the ship says several times that she was going at an angle of 45 degrees, while an observer on the shore testifies that she was going down the river crosswise. The effect on the barge eloquently testifies in what direction the ship was going, and with what momentum.

I think what happened was this: Say there was 800 feet of water between the ships anchored on the east side of the channel and the pier heads, we must take off the width of the tug Mary and her barge, say fifty feet, and the length of the ship, 439 feet, leaving 311 feet or a hundred and twenty feet less than the ship's length, to turn around in after she should get clear in the river. A strong ebb tide was known to be running down the river, and a tug was attached to the port quarter, facing the river, to push the stern up the river and so turn the ship around, as she backed out. But when the stern got out where the current was strong in the center of the channel the tug failed to push the stern up against the current, so that the backing ship was about to hit the ships anchored across the channel, being about 75 feet from them. So the ship had to go forward, but without space enough to get steerage and point down the river. She was in fact drifting all the time down the river sidewise. The master and pilot say they began to "back and fill" in order to straighten her out, and she came towards the tug Mary so close that the watch on her thought the tug would be hit and got off onto the barge between her and the pier. She passed below the Mary, but still backing and filling she hit the barge next below. It had been sighted by the ship's lookout a hundred feet away, but he did not report it till asked by the pilot when within 40 feet. The pilot says he could not see a low lying barge be-

cause of the height of his ship's prow. He knew the pier was there, but would have hit it, I think, if the yielding barge had not cushioned the blow, and stopped the ship. The ship was probably saved serious damage to herself. The lookout did not need a light on the barge for he saw it. The pilot could not have seen the light so low down for the same reason he could not see the barge. The absence of the light played no effective part. The truth is that the ship was out of control.

The tug was dismissed after the collision. It also departed without effort to find out the damage or report itself. Its failure to turn the ship had a part in getting the ship into trouble, but no witness from the tug was produced. The true and sole cause of the injury was the effort to turn a large ship around against a strong current in the river with insufficient space.