**Ove SKOU, Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 74–3366.**

United States Court of Appeals, Fifth Circuit.

Jan. 23, 1976.

---

Nathaniel G. W. Pieper, Tampa, Fla., for plaintiff-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Oscar Blasingame, Asst. U. S. Atty., Tampa, Fla., Alfred H. O. Boudreau, Jr., Admiralty & Shipping Section, Dept. of Justice, Morton Hollander, Ronald R. Glancz, Dept. of Justice, Civil Div., App. Section, Washington, D. C., for defendant-appellee.

Before TUTTLE, THORNBERRY and CLARK, Circuit Judges:

TUTTLE, Circuit Judge:

Ove Skou, owner of the cargo liner MADS SKOU, appeals from that part of the judgment of the trial court which denied it damages for the loss of the vessel's use for a period of 10 and ⁵/₁₂ days occasioned by having been struck and holed by an assisting Army tug. The trial court allowed damages by way of compensation for all of the repairs rendered necessary by the collision.

On May 10, 1969, while the plaintiff's vessel was maneuvering away from a dock it was struck and damaged by the tug. As a result, she put into Tampa, Florida, the nearest available port capable of rendering repairs, and in this fashion her voyage was interrupted for 10 and ⁵/₁₂ days. In the original action brought by the plaintiffs against the United States, the trial court awarded the ship owner a judgment which included reimbursement in full for the cost of repairs, for costs incidental to completing repairs and for the gross daily charter hire being paid to the ship owner by her charterer, which, by terms of the charter, was suspended while the ship was in repair. The United States appealed only as to the last item. On appeal, this Court held that the burden was on the owner to show actual damages resulting from the 10 and ⁵/₁₂ days loss of the use of the vessel and that the record made at the time of the trial showed only the loss of use and failed to disclose elements that would constitute actual damage. *United States of America v. Ove Skou,* 478 F.2d 343 (5th Cir. 1973). This Court remanded the case to the trial court to afford the plaintiff an opportunity to show that it, in fact, sustained a financial loss as a result of the delay. Upon the second trial, the trial court held that the plaintiff failed to carry the burden. Now, the formerly successful plaintiff appeals from that judgment. The owner also appeals from the failure of the trial court to grant interest on the judgment for the actual damages not contested by the United States from the date of the original judgment, rather than from the current judgment which, as to these items, is for the same amount.

In our previous opinion, we indicated the nature of the proof required to establish the claim asserted by the plaintiff. We said:

"The dearth of evidence here prevents our concluding whether, during the market of May and June 1969, vessels of the Skou's tonnage and design were customarily under charter every day of the year, whether there were lengthy inactive periods between char-

ters, or whether actual experience was somewhere in between. The ship in question arrived at its designation ten days late and was not rechartered until fourteen days later, or 24 days from its original scheduled arrival date. There is no evidence that a subsequent charter commitment was breached, or that the shipowner, knowing the approximate length of the repair period, made any attempt to arrange for a subsequent charter. . . ." 478 F.2d 343, 346.

Further explaining the issue this Court said:

"The burden of proof on the shipowner is not excessive. He need prove only that profits 'have actually been or may be reasonably supposed to have been lost.' The Conqueror, 166 U.S. [110] at 125, 17 S.Ct. [510] at 516 [, 41 L.Ed. 937.] Counsel for the plaintiff admitted on oral argument that he could have introduced expert evidence of the ship's marketability. We remand this case to the district court to give the plaintiff an opportunity to introduce evidence of actual loss, and we leave to the district court the factual determination whether such evidence is sufficient to satisfy the shipowner's burden of proof. *Cf. Brooklyn Eastern District Terminal v. United States of America,* 1932, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240." 478 F.2d at 347.

It is clear, of course, as the Government contends that findings of fact by the trial court in Admiralty cases are not subject to reversal unless determined on appeal to be "clearly erroneous." *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20.

As stated by this Court in *Galena Oaks Corp. v. Scofield,* 218 F.2d 217 (5th Cir. 1954), and cited many times since:

"Insofar, however, as the so-called 'ultimate fact' is simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, it is 'subject to review free of the re-straining impact of the so-called "clearly erroneous" rule.' " 218 F.2d at p. 219, citing *Lehmann v. Acheson,* 3rd Cir., 206 F.2d 592, 594.

All of the evidentiary facts relied upon by the trial court in concluding that the evidence showed that the plaintiff was not entitled to recover were supplied by the plaintiff and, of course, are binding against it. We accept these evidentiary facts as true.

■ In order adequately to assess the interpretation of the historical facts by the trial court and in order to indicate the reason for our disagreement with its ultimate judgment, we quote the trial court's "findings of fact" in full:

"1. Repairs completed at Tampa, the MADS SKOU resumed her voyage on May 21, 1969. On May 29, while the MADS SKOU was enroute to Glasgow (via Dublin, Ellismere and Liverpool) Columbus Line, agent for Hamburg Sud, inquired by telex message whether plaintiff could furnish a 'vessel in time charter, delivery USNH' [that is to say, at a port in the United States north of Hatteras] 'last half June . . .' (Emphasis in original). Subsequently, on June 5, 1969, Hamburg Sud and plaintiff executed a time charter providing for delivery of the vessel to Hamburg Sud 'on passing Belle Isle or Cape Race Owner's option' between the dates of June 20 and June 29, 1969. The vessel was in fact delivered off Cape Race on June 27, 1969, at 1:45 p.m. This was within the stipulated time of the contract and certainly within the 'last half June.'

2. Now the significance of this is that the MADS SKOU only had three charter party opportunities available had no collision with the Army tug occurred. This was the charter party which was in fact signed, one for the MARIE SKOU or substitute and one for the INGER SKOU or substitute.

3. The charter party for the MARIE SKOU for which the MADS SKOU could have been substituted was dated

June 5, the same date as the charter party with Hamburg Sud which was performed by the MADS SKOU. The MARIE SKOU charter party (for lack of a better name) provided for delivery of a vessel at Skaw, Denmark, two days sailing time from Glasgow, where the MADS SKOU was redelivered by its charterer, Harrison Lines, at 10:00 p. m. on June 19. Delivery under the MARIE SKOU charter party was permitted in terms between June 21 and June 29; hence the MADS SKOU could easily have performed this charter. This is admitted by plaintiff's vice-president, Gundel, who also admitted that the MADS SKOU could have performed the INGER SKOU charter party scheduled to commence at Jacksonville, Florida, between June 25 and July 5. Now, the MADS SKOU was chosen instead of the other ships to perform the Hamburg Sud contract 'because of her recent dry docking' i. e. on June 20–22, for bottom cleaning and painting, after her redelivery to plaintiff by Harrison at Glasgow. But the important point is that plaintiff's own evidence shows that the MADS SKOU had only three charter opportunities after the collision voyage; she was employed on the one her owners wanted her to be, within the terms of the charter party and at the time when her charterer wanted her. Those elementary considerations should result in the dismissal of plaintiff's claim for lost charter hire. (footnote omitted)."

The difficulty with the trial court's assessment of the evidence is that it focused completely on the admitted fact that MADS SKOU was not prevented from performing any subsequent charter party available to it because of the 10 and ⁵⁄₁₂ days delay due to the accident.

The whole thrust of the plaintiff's case is that because of the delay while the ship was under repairs it was off the market for future charterers and the time at which it could *commence* its next charter was delayed by that same number of days.

While the charter party signed on June 5 gave a "lay day" or starting time of June 20 and ran until June 29,[1] the evidence discloses that as indicated by the above findings of fact, Hamburg Sud, the party negotiating for the charter and who, in fact, actually signed it on June 5, originally wished to have the vessel available by June 15 but, in the negotiations, as testified to by deposition by the operating manager of OVE SKOU, the owner knew that the vessel would not be available until after June 20. The owner, after testifying that he knew the vessel would be delayed because of the collision was asked: "What reason, if any, is there that the charter party provides that the time is not to commence before June 20, 1969?" He answered: "Because that was the estimated readiness of the ship at the time of negotiations and fixture."

Thus, it appears that if the MADS SKOU had not been delayed for repairs and had been redelivered to its owners on June 9 or 10, as testified to by the witness, and had then spent three days in dry dock for "normal, annual cleaning and painting,"[2] it would have been available to the inquiring prospective charterer by June 13[3] and, had the lay day been set at June 15, as originally suggested by the prospective charterer, it could have been delivered for the next charter on the 15th, since the option as to when delivery was to be made was within control of the owner, so long as it was accomplished after the lay day and

---

1. This means that the owner could supply the vessel off Cape Race at any time beginning June 20 up to and including June 29.

2. The testimony was undisputed that this class of ship was dry docked for these purposes normally each year, ranging at periods from nine to twelve or thirteen months, and that

this operation in June of 1969 was 10 months following the last such operation.

3. We take the date of June 10 as the redelivery date because this is against the interest of the witness' principal according to the disposition which we make of the case.

before the surrender day. However, in light of the fact that delivery was to be made off Cape Race, off North America, the actual delivery to the new charterer could not have taken place until June 18, since it did not become effective until delivered by the owner off Cape Race. Instead of this occurring, however, the MADS SKOU was released to the owners on June 19, and was in dry dock until the 22nd, and was then delivered off Cape Race on June 27. This clearly, as stated by the trial court, was in performance of the charter party entered into by MADS SKOU on June 5 and it was a charter party which was desired by MADS SKOU. However, it did not go into effect until nine days later than would have been the case had there not been a delay on account of the repair of the vessel in Tampa.

The trial court seemed impressed with the fact that MADS SKOU was not prevented from carrying out the charter party it desired. The court entirely overlooked, however, the fact that in doing so it was unable to perform by delivering the vessel to the charterer until nine days later than would have been the case but for the accident.

The trial court also was impressed by the fact that the MARIE SKOU, a sister ship, was subject to a charter party at Skaw, Denmark, which could have been completed by substituting MADS SKOU within two days of its redelivery in Glasgow on June 19. Thus, since under the MARIE SKOU charter party, delivery was permitted between June 21 and June 29 "the MADS SKOU could easily have performed this charter." It is difficult to see the relevance of this fact, since we have noted above that MADS SKOU was already redelivered to its owners on June 19, and it then performed normal dry docking operations before being committed to the next charter, which would have brought the date up to June 24, if MADS SKOU had been assigned to MARIE's run. None of this information is of any value to the trial court in deciding the issue before it, since there was no evidence as to where

the MARIE SKOU was in order to perform, in exchange, the charter party which had been undertaken on behalf of MADS SKOU. Neither is there any evidence as to MARIE SKOU's condition as to need for dry docking before the more than 80 day round-trip to Australia and New Zealand to which the MADS SKOU was obligated, if MARIE had been positioned in a manner to take her place.

The same reasoning applies to the court's comment on the fact that MADS SKOU could have taken on the charter arranged for INGER SKOU. The difference is that under that charter party the charterer would not have been required to take delivery of any one of the three vessels prior to June 25, which of itself would have been a delay of 10 days beyond June 15 which was the first date suggested as being desired by the charterer.

Faced with a situation that these three ships would be available within the overall period, June 20 and July 5, and without any evidence in the record to indicate the actual availability of the vessels other than MADS SKOU, except that at some time prior to the cancellation dates of June 29 and July 5 respectively for MARIE and INGER they could have been replaced by MADS, we conclude that there was no basis for the trial court's denying the owner a right of recovery for the delay on the ground that the management decided to commit MADS SKOU to perform its own charter party instead of the other ships "because of her recent dry docking." This is particularly true in light of the undisputed evidence that before essaying a round-trip to Australia and New Zealand particular consideration would be given to the need of a vessel for painting and cleaning attention because of the lack of dry docking facilities on that trip.

In sum, we have the inquiry from Hamburg Sud, the future charterer, as to a charter effective the last half of June; we have the testimony of the officer of the plaintiff that he was unable to commit the ship until after June 20, because of the delay occasioned by the re-

pairs in Tampa; we have the undisputed evidence that but for the delay, MADS SKOU would have been redelivered to the owners on June 9 or 10 and that she then spent three days in dry dock; we find that the charter actually entered into on June 5 with Hamburg Sud provided for delivery at Cape Race, so that the daily charge for the vessel, $1,850 under the charter party, would not commence until delivery there; departure under ballast for Cape Race, commencing on June 14 would have been completed in five days, according to the actual performance later in the month, thus permitting delivery of MADS SKOU to the new charterer on June 18, nine days earlier than was actually possible,* because of the delay occasioned by the accident.

We think the only conclusion that can be drawn from this state of facts is that the plaintiff has clearly proved that nine days, at least, out of the current year's income from MADS SKOU has been lost because her owner was unable to deliver the vessel to its next charterer until nine days later than would otherwise have occurred. This results from the fact that it was necessary for OVE SKOU to negotiate a new charter party in light of the already recognized 10 and $5/12$ day delay, which is ample proof that "the shipowner, knowing the approximate length of the repair period, made [an] attempt to arrange for a subsequent charter." 478 F.2d at 346. Most clear, however, is the proof that MADS SKOU was in immediate demand, as were her sister ships, upon her return to service. This demonstrates "that profits may be reasonably supposed to have been lost because the vessel was active in a ready market." 478 F.2d at 344.

The facts all being undisputed there remains only the necessity of drawing a conclusion as to whether they were sufficient to require the Court to find that the ship owner had carried its burden. We conclude that the ship owner here proved, and that the trial court erred in not finding, that profits "may be reasonably supposed to have been lost."

There remains, as to this prong of the appeal, only the matter of the amount to be allowed to the shipowner for lost profits. The fact that before the current ill-starred voyage had been completed, MADS SKOU had already been chartered for its next voyage as soon as available at $1,850 per day would justify a recovery of $1,850 per day for the number of days which we have determined proof shows may be reasonably supposed to have been lost by the MADS SKOU. However, in light of the fact that the hire for the vessel under the charter in effect at the time of the accident was $1,750 per day and in view of the fact that appellant now claims that this amount should be allowed rather than to have the case remanded to the trial court for a further hearing, we conclude that the daily charge of $1,750 is the minimum which could have been awarded by the trial court on the evidence before it. Therefore the judgment will be amended correspondingly.

■ We finally consider appellant's second claim. That is, that it is entitled to interest on the sum of $33,656.12 from the date of the first judgment rather than from the date of the entry of the current judgment entered some two years later.

The Public Vessel's Act, 46 U.S.C. § 782, allows post-judgment interest on any claim against the United States at 4% per annum. It contains the proviso: "no interest shall be allowed on any claim up to the time of rendition of judgment."

As noted by this Court in its earlier opinion, only $18,229 was in dispute out of the original award of $51,885.12 together with 4% interest which the Court allowed at that time. We did not enter a judgment of general or unqualified reversal. The first paragraph of the opinion stated: "We reverse the district court's *award of damages for detention* and remand to allow the shipowner to prove actual loss, etc." (Emphasis added). 478 F.2d at 344. The final paragraph of the opinion stated: "Reversed

and remanded for further proceeding *not inconsistent with this opinion."* (Emphasis added). This was clearly not an unqualified reversal of the judgment, but simply a modification of it, by eliminating the item of $18,229 for detention of the ship subject to the shipowner's right to a new trial on that issue alone. Under the provisions of § 2106 of Title 28 U.S.C. such a modification is clearly within the power of a Court of Appeals.[4]

Neither the Government nor the trial court at the second trial considered that there was any doubt or question remaining as to the Government's liability for the sum of $33,656.12 included in the award by the trial court on June 8, 1972. What, and all, that happened on the second trial was that the Court heard evidence with respect to the remaining claim with which we have already dealt in this appeal, the only part of the original judgment reversed. Upon conclusion of the hearing on this issue, the trial court entered the following judgment:

> "Ordered and adjudged that the plaintiff OVE SKOU recover of the defendant United States of America the sum of $33,656.12 with interest thereon at the rate of 4% per annum from date of entry of this judgment and its costs of action."

We are required to determine whether the prohibition against allowance of interest "up to the time of rendition of judgment" prevents the allowance of interest on the uncontested amount allowed against the United States by the first judgment because of the subsequent qualified reversal of that judgment. We conclude that it does not. As already noted, this Court, in the opinion, which was incorporated in the judgment by reference, clearly *reversed* only one item of the total judgment of the trial court. Perhaps it would have been tech-

nically clearer had this Court used the formulation: "Affirmed in Part and Reversed in Part." This would not be technically correct, however, because the Government did not appeal from that part of the judgment representing the out-of-pocket expenses for repairing MADS SKOU. In any event, we conclude that the remand of the case "for further proceedings not inconsistent with this opinion" had the effect of a qualified reversal or modification of the judgment which left effective the part of the original judgment not appealed from. In sum, we hold that the words "the time of the rendition of the judgment" refer in this case to the time of the rendition of the first judgment as to the sum of $33,356.12 out of the total award of $51,885.12. It is an outstanding unpaid, unappealed obligation of the United States and has been since June 8, 1972.

This Court's decision in *Coyle Lines v. U. S. A.,* 198 F.2d 195 (5th Cir. 1952) seems apposite. That decision modified a decision reported at 195 F.2d 737 (5th Cir. 1952). In *Coyle* the trial court, in an action brought under the same statute applicable here found that *Coyle* the libellant and the Government libellee were guilty of mutual fault in a collision and awarded *Coyle* a judgment with interest for $10,830.67, one-half of the undisputed damages claim. On appeal this Court determined that the United States should be decreed solely at fault and be "condemned to pay to libellant, Coyle Lines, Inc., the full amount of its damages with interest and costs." 195 F.2d at 742. Subsequently, upon motion, this Court entered a further order providing that "the interest on damages should be calculated at the rate of 4% per annum until satisfied and *should run from April 25, 1951,* the day on which the libellant

---

4. Section 2106 provides: "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the en- try of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

was originally *entitled* to judgment in the District Court. . . ." (Emphasis added). 198 F.2d at 196. It is to be noted that in that case the Court fixed the date for the running of interest at a time when judgment for the disputed amount *should* have been entered, but was not. Here we deal with a date when judgment for the full amount *was* entered and which, as noted above, has never since been questioned.

We, therefore, hold that since the original award of $33,656.12 with interest at 4% per annum was not dealt with by this Court as part of the judgment which was reversed, the entry of the subsequent judgment on August 15, 1974 did not, of itself, have the effect of terminating the running of interest from the date of the first judgment. *Cf., Masculli v. United States,* 383 F.Supp. 50 (E.D.Pa. 1974).

Because of the failure of appellant to undertake more explicitly to establish when redelivery of MADS SKOU would have been made as between June 9 and 10 and because of the failure to pinpoint the hours of the different days involved, we deal here with nine whole days only, because that is the most the plaintiff clearly proved; thus, the judgment must be modified by adding the sum of $15,-750 to the amount entered on August 15, 1974. It must also be modified by changing the date from which interest is to run on $33,656.12 from August 11, 1974 to June 8, 1972.

The judgment of the trial court is modified so that it will read as follows:

"It is ordered and adjudged that the plaintiff OVE SKOU recover of the defendant United States of America the sum of $49,406.12 with interest at the rate of 4% per annum on $33,-656.12 from June 8, 1972 and on $15,-750.00 from the date of the entry of this judgment."