**Punt SISUNG and Gus Fitzgerald**

v.

**TIGER PASS SHIPYARD CO., Inc.**

**No. 3697.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 15, 1961.

Faris, Leake & Emmett, and T. C. W. Ellis, New Orleans, La., for plaintiffs.

Deutsch, Kerrigan & Stiles and Paul A. Gaudet, New Orleans, La., for defendant.

WALTER E. HOFFMAN, District Judge.

This libel in personam seeks the recovery of $7,500, the admitted value of the crewboat Rhea III. The Rhea was a wooden hull craft between 32 and 34 feet in length and 10 feet in beam. She had a draft of about three feet, and was powered by two gasoline engines. Libellants, Sisung and Fitzgerald, each owned a one-half interest in the vessel.

On or about May 5, 1958, the Rhea was brought to respondent's shipyard for repairs. She previously had been repaired in the same yard. Libellant, Sisung, was and is the president and a major stockholder of this shipyard. The libellant, Fitzgerald, was at one time the owner of a one-quarter interest in the shipyard, but at the time this controversy arose he had disposed of his interest.

Tiger Pass Shipyard is located near Venice, Louisiana, on the east bank of Tiger Pass, which leads from the Mississippi River. At the shipyard and for some distance above it Tiger Pass is about 200 feet wide. The shipyard is the sole establishment on that side of the Pass in that vicinity. On the opposite, or west, bank are the docks and facilities of the Humble Oil Company and the facilities of Haliburton and of McDermott. All witnesses testified that there was a "considerable amount" or "heavy" traffic on the Pass at all times, day and night, and that there is a constant current in the Pass, flowing toward the Gulf.

On June 5, 1958, after the repairs had been completed on the Rhea III, the libellant, Sisung, came to the yard. He was informed by Chauvin, the yard foreman and manager, that the repairs were completed. He examined the boat and signed the invoice indicating approval of the repairs. Thereafter Sisung told the yard manager to put the vessel overboard and instructed him to tie it downstream from the shipyard, below the bulkhead. He also told Chauvin to telephone the libellant, Fitzgerald, advising him that the boat was ready, and requesting him to come and pick it up. Sisung testified that when an owner signed a bill for repairs, the work was thereby accepted and the vessel was at owner's risk. It was for this reason, he so testified, that he instructed Chauvin to moor the Rhea

at the location described above. He stated that he considered this spot about the safest location in the yard at that time.

Chauvin states that he moored the Rhea, by a bowline only, to a willow stump at or just below the end of the bulkhead which extended across the front of the shipyard along Tiger Pass. There was navigable depth water at this bulkhead. It is customary to moor vessels in this manner along the Pass, a stern line being unnecessary since the constant current in the area keeps the stern of a vessel close in against the bank when the vessel is secured by a single bowline. All witnesses agreed that only a storm or a violent and erratic gust of wind could cause a vessel so moored to swing out into the main stream of the channel.

After mooring the vessel Chauvin telephoned Fitzgerald. There is some dispute as to what was said between them. Fitzgerald testified "someone" told him over the telephone, around five P.M., that the repairs were completed and that the vessel had been launched. He did not recall anyone telling him where or in what manner the vessel was moored. He at first testified that, since he was busy when Chauvin called, he told him he didn't have time to call for the boat and that he would come for the Rhea the next day. On cross-examination, confronted with a prior statement, Fitzgerald seemed doubtful as to whether he actually said *when* he would send for the vessel. Chauvin testified positively that Fitzgerald did not say when he would pick it up. It is apparent that Fitzgerald did not say that he would send someone for the vessel and that he did not, in fact, send anyone that evening.

On previous occasions the Rhea had been repaired at this yard and the vessel was generally picked up within one or two hours after the work was completed. Sometimes a hired captain called for the boat. Sisung testified that there were such captains available at this time, and that the boat had been working part-time previous to going in for repairs. Fitz-

gerald did not testify to the contrary. Fitzgerald's testimony was, in effect, that (1) he knew the vessel had been repaired; (2) she had been launched; (3) she was tied up somewhere at the shipyard; and (4) he simply did not get around to sending for her that evening, although he had intended to. He gave Chauvin no instructions as to where the vessel should be tied up, and he knew, from past experience, that the shipyard did not have a night watchman or a slip within which the vessel could be secured.

Immediately after talking with Fitzgerald, Chauvin left the yard. During the night the Rhea apparently was struck with considerable force on the port side, about amidships, as she lay starboard side to against the bank. The vessel had no lights burning on her, although she was equipped with lights. There were three floodlights of 300 to 500 watt power mounted in the yard which burned night and day. The vessel was painted white and the nearest light was about 75 feet away. The testimony of Chauvin and Cunningham, the latter being a yard employee who was at the yard overnight, was that these floodlights threw "some" light into the area where the Rhea was moored. The details of the accident are unknown. The only clues come from the condition of the vessel itself and from the testimony of the yard man, Cunningham. The vessel was damaged beyond repair and she was driven part way upon the bank where she was moored.

Cunningham was not a "night watchman" as such. He worked at the yard during the day and was allowed to sleep in a trailer on the yard as a part of his pay. He helped launch the Rhea during the afternoon and knew where she was moored. He testified he went to bed around nine o'clock that night. He last saw the Rhea before retiring about 8:30. At that time she was lying downstream, starboard side to against the bank, and floating well. The trailer in which Cunningham slept was 150 to 200 feet from where the Rhea was moored. During the night he heard many noises.

He said that frequently vessels coming upstream turn at Tiger Pass Shipyard and that they often let their tows swing in and hit the bank, or trees along the bank, to help turn them. These tows frequently hit the bank with a loud noise 100 feet or so below the yard. On at least one occasion such a tow had actually hit the bulkhead at the yard. At one time during the night Cunningham heard what he described as an "unusual" noise, but he did not think anything of it and did not get up to investigate. Around 11 P.M. he arose, smoked a cigarette, and went to the outside toilet. At this time he noticed the Rhea was leaning and, upon closer examination, that she had been rammed. He saw no other boats in the area at that time. He did not call anyone or take any other action, but went back to bed. Fitzgerald was notified early the following morning.

The libellants claim that: (1) the shipyard was a bailee and, under Louisiana and maritime law, the mere showing of damage to the chattel shifts to the bailee the burden of explaining how the damage occurred, and the further burden of establishing that it was not the fault of the bailee; libellants contend that respondent has not sustained this burden; (2) even if the bailment had ceased which it expressly denies, respondent is liable on a theory of negligence in that (a) it failed to investigate the cause of the damage, and (b) it improperly moored the Rhea in a negligent manner, without the lights required by law, and without leaving an attendant or watchman on duty.

Respondent contends that under the applicable law the burden of proof remains at all times on the libellants as bailors, but that showing delivery in good condition to the bailee and return damaged, or no return, raises a "presumption" which shifts the burden of going forward with the evidence to the respondent. Respondent claims to have met this burden and that libellants have failed to carry their overall burden of persuasion.

In any event respondent takes the position that the bailment was at an end when Sisung signed the invoice and instructed libellants to launch the vessel, and that it had no further responsibility to the owners; in short, that the Rhea was, at the time of the collision, at "owner's risk" as Sisung testified. Respondent also denies any negligence on its part.

Both libellants and respondent agree that this case is governed, in part, by Commercial Molasses Corporation v. New York Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 161, 86 L.Ed. 89. It appears that the burden of proof (risk of non-persuasion) does not shift in a bailment situation such as this, but merely the burden of going forward with the evidence to overcome the "presumption" raised by proof of delivery to the bailee in good condition and return to the bailor in damaged condition, or no return at all. Pointing out that the bailee of goods, who has not assumed a common carrier's obligation, is not an insurer, and that the law merely imposes upon the bailee the duty to come forward with the information available to him, the Supreme Court said (Gunther v. Liverpool & L. & G. Ins. Co., 134 U.S. 110, 111, 10 S.Ct. 448, 33 L.Ed. 857):

"Whether we label this permissible inference with the equivocal term 'presumption' or consider merely that it is a rational inference from the facts proven, it does no more than require the bailee, if he would avoid the inference, to go forward with evidence sufficient to persuade that the non-existence of the fact, which would otherwise be inferred, is as probable as its existence. It does not cause the burden of proof to shift, and if the bailee does go forward with the evidence enough to raise doubts as to the validity of the inference, which the trier of facts is unable to resolve, the bailor does not sustain the burden of persuasion which upon the whole evidence remains upon him, where it rested at the start."

Applied to the case at bar, by showing failure to deliver the vessel in as good condition as she was in when she was turned over to the shipyard, libellants forced the shipyard to come forward with the information available to it. The risk of persuasion, the technical "burden of proof", remained where it always was, on the libellants. Clearly the respondent has met the burden imposed on it and has come forward with the information available to it. It has shown that it has no more actual knowledge of how or why the collision occurred than what was available to libellants. Respondent has told all it knows—it cannot be forced to divulge more and should not be penalized for its failure to do so.

■ Respondent urges that the bailment terminated when Sisung signed the invoice and directed the launching and mooring of the vessel. Generally speaking, the duration of a contract of bailment is to be determined by the intent of the parties as expressed or necessarily implied from the terms of the contract itself. Disagreeing with respondent in its contention that the bailment had ceased when Sisung took the action referred to herein, it need only be pointed out that such a ruling would absolve the shipyard of any responsibility for the negligent handling of slings while the boat was being lowered into the water. Obviously this could not have been the intention of the parties. It is more reasonable to argue that the bailment terminated when the vessel was actually launched and moored in accordance with the request of the libellants, or one of them, and the libellants knew of this fact. Particularly is this true when libellants were aware of the lack of facilities for over-night mooring, and that the Rhea would be subject to normal traffic hazards as she lay starboard side to against the bank. Manifestly there must be some point in time when the delay in calling for the vessel transfers the risk to the owners and, if it were necessary so to do, the Court would find that, under the peculiar circumstances of this case, the bailment ceased when the boat was launched and moored in accordance with the directions of one of the libellants, and libellants were properly notified of such action with no special instructions given to respondent for overnight care.

■ We turn to the issue of negligence. There is no merit to the contention that the Rhea was moored improperly. An aerial photograph taken subsequent to the destruction of the vessel demonstrates that boats customarily are moored by a bowline only, in tight against the bank, both along the banks of the Pass and along the banks of the Mississippi. The constant current in the Pass was sufficient to hold a boat tight against the bank when moored as aforesaid. The physical facts demonstrate that the Rhea was struck amidships on her port side with considerable force, and driven upon the bank. Had the vessel floated out into the main channel it is highly unlikely that this damage would have resulted. Admittedly the Rhea, as she was moored, protruded slightly into the navigable stream, thereby subjecting the vessel to the hazards of traffic, permitting their tows to hit against the bank, but the physical damage does not suggest that this was the cause of the collision.

In the final analysis the question is whether the respondent exercised reasonable care under all the circumstances. While there were available slips in facilities on the opposite bank of the Pass, there was evidence of acts of piracy on these docks and, considering the fact that Fitzgerald may have called for the Rhea after the shipyard had closed, it was not unreasonable for the respondent to moor the vessel in the manner and place disclosed by the testimony.

Much has been made of the fact that the libellant, Sisung, is "wearing two hats" in his capacity as a co-owner of the vessel and an officer and stockholder of the respondent corporation. While such a fact places the real party in interest, presumably the insurance carrier for the Rhea, in an unfortunate position,

it does not follow that Sisung's testimony should be totally disregarded. In directing that the vessel be moored in the manner and place described, Sisung stated that he considered this to be the safest location on the yard. Indeed, there is no evidence to the contrary. His primary concern, in any event, was the safety of the boat and making it readily available to its co-owner, Fitzgerald.

■ The final contention is that respondent was negligent in not placing lights upon the Rhea when it was apparent that the shipyard would close before Fitzgerald could pick up the boat. Libellants seek to invoke the Pennsylvania rule, contending a violation of the Code of Federal Regulations, Title 33, § 80.16a. In the opinion of the Court the entire section is inapplicable to the facts of this case. Section 80.16 regulates lights on barges, canal boats, scows and other nondescript vessels on certain inland waters on the Atlantic and Pacific Coasts, excluding the Great Lakes and Western Rivers. It specifically deals with the described vessels "when being towed by steam vessels." Subsection (a) describes the vessels on what waters the whole section is to govern. Subsections (b) through (i) give detailed regulations as to lights on "towed" vessels. Unless a vessel comes within the description of subsection (a), either as to type vessel or location, the subsequent subsections do not apply.

The structural scheme of § 80.16a is similar to § 80.16 described in the above paragraph. It, however, deals with different waters, namely, the Gulf Coast and Gulf Intracoastal Waterway. As in § 80.16 it refers to certain type vessels "when being towed by steam vessels". While the Rhea was unquestionably in waters described in § 80.16a, she was not a barge, canal boat, scow, or other vessel of nondescript type. She was, in fact, a self-propelled crewboat, but, assuming arguendo that this is sufficient to place her in the category of a "nondescript type vessel," she was definitely not in tow. The manifest purpose of the entire section is to regulate lights on towed vessels. See subsection (h) referring to "such tow."

Finding that there were no statutory violations with respect to lights, we turn to the question as to whether good seamanship and due care imposed a duty upon respondent to illuminate the lights on the Rhea. The hull of the vessel was painted white. At least one of the lights from the shipyard caused some illumination of the Rhea. There is no testimony as to the vessel's visibility from the channel of the Pass, and it is reasonable to conclude that, since the light was behind the boat, if she was visible at all, it was in silhouette. The case of Coyle Lines, Inc. v. United States, D.C.E.D. La., 96 F.Supp. 821, is somewhat similar but, in the matter now under consideration, we do not have a situation calling for the application of the Pennsylvania rule. It is difficult to conceive of a reasonable man unfailingly turning on the lights of the Rhea under these circumstances when she was illuminated by lights from the yard; it was not anticipated that she would remain there overnight; there was no safer place to moor her; it was a clear night; the rules do not require lights on a vessel moored along the bank or at a wharf and, in fact, it was customary in the area to moor vessels in this manner and without lights.

■ There is no merit to the argument that a night watchman should have been provided. Libellants knew that such service was not available. Even if a watchman had been on the yard, there is little likelihood that he would have seen or heard more than the witness, Cunningham. In the absence of a special contract, we know of no prevailing rule requiring a small shipyard to maintain a night watchman on duty to observe the safety of, and possible collision with, vessels moored to the dock or bank nearby.

Adopting this memorandum in lieu of specific findings of fact and conclusions of law in accordance with General Admiralty Rule 46½, 28 U.S.C.A., proctors

for the respondent are directed to prepare and present an appropriate decree dismissing the libel herein, after first submitting same to proctor for libellants for inspection and endorsements.