In re OIL TRANSPORT CO., Inc., Petitioning for Exoneration from, and Limitation of, Liability.

In re CHARLES C. SMITH CO., Petitioning for Exoneration from, and Limitation of, Liability.

Nos. 508, 512, Admiralty.

United States District Court
E. D. Louisiana,
Baton Rouge Division.
Oct. 21, 1959.

Deutsch, Kerrigan & Stiles, Paul A Gaudet, William S. Stone, New Orleans, La:, for petitioners.

James J. Morrison, Raymond H. Kierr, Arthur A. de la Houssaye, Browne & Rault, Gerard Rault, New Orleans, La., Mandell & Wright, Herman Wright, Houston, Tex., for claimants.

J. SKELLY WRIGHT, District Judge.

On May 19, 1950, at approximately 9:30 p. m., the towboat Jane Smith [1] capsized, foundered and sank in the Atchafalaya River after striking a railroad bridge at Melville, Louisiana. This litigation concerns limitation of liability proceedings filed by her bareboat charterers [2] and her owner, together with the

---

[1]. The Jane Smith was a typical Mississippi River towboat. She was a single screw vessel, 100 feet in length, 22 feet in beam, with a molded depth of 8 feet, 3 inches, powered by one 1600–hp General Motors Diesel engine, pilot house controlled. She had one steering and two flanking rudders. She was built for petitioner Smith at Houston, Texas, and was completed in June, 1948.

[2]. 46 U.S.C.A. § 186 reads:

"The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner·

claims of representatives of members of the crew who lost their lives in the casualty. There is an additional claim by one survivor.

On the morning of May 19, 1950, the Jane Smith, with two empty oil barges [3] in tow, docked at Simmesport, Louisiana, to effect minor engine repairs and to pick up a pilot, Captain Verret, to assist in the navigation down the Atchafalaya from Simmesport to Morgan City. At 6:30 p. m., the same day, she departed Simmesport with the same two barges strung out and faced up to her head in the normal manner with two 1⅛″ wires and ratchets on each side, two 1″ wires criss-crossed as a jockey, and a 7″ Manila line as coupling.

At about 9:15 p. m., the Jane Smith and her tow rounded a bend some three-quarters of a mile above the Texas and Pacific Railroad Bridge at Melville, Louisiana. Her skipper, Captain Weldon, signaled for the bridge to open, reduced speed and lined up his flotilla on the draw. The Melville Bridge is supported on cylindrical concrete piers. The draw is a lift span 160 feet wide with no approach fenders. The solid span of the bridge has a width of 500 feet. At the time, the Atchafalaya River was at high stage with a downstream current between four and six m. p. h. The set of the current was to the east into the bend, with the reverse current coming out of the bend setting slightly to the west. It was this reverse current which would affect the navigation of downbound vessels approaching the bridge and lining up on the draw.

The bridge did not respond to the signals of the Jane Smith to open. Captain Weldon and Captain Verret, conning the flotilla from the wheel house of the Jane Smith, allowed the flotilla to drift down to within 200 feet of the bridge before

backing away for a new approach. Without a second signal, the Jane Smith again made a run on the closed bridge, only to back away a second time. After further signaling, the bridge was opened and the Jane Smith made her approach. By this time the flotilla, instead of being lined up with the draw, slightly to the east to allow for the set west, was on a 45° angle to port, probably the result of backing the single screw [4] of the Jane Smith.

Despite the angle, the Jane Smith continued her approach until the port bow of the lead barge collided with the inner side of the east pier of the draw, veering the head of the tow sharply to the west, and pivoting the towboat to the east despite engine and wheel attempts to counteract the forced direction of the tow. The starboard side of the lead barge then struck the west pier of the draw, snapping the starboard face lines of the tow and swinging the Jane Smith to port and broadside to the current. When the Jane Smith jackknifed around the east pier, the port face wires parted and the superstructure of the vessel fetched up against the fixed span of the bridge, the bottom girders of which were some 18 or 20 feet above the surface of the water. The current swept the hull of the vessel under the span, causing her to heel so that her starboard side up to her deckhouse was awash. After passing under the span, the Jane Smith righted herself and sank within seconds. Captain Verret, one of the claimants here, survived but her master, Captain Weldon, and four other members of her crew went down with their ship.

### Motion to Dismiss

On May 31, 1950, the Oil Transport Company, Incorporated, charterer of the Jane Smith and the two barges, filed one of the two limitation proceedings

---

of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels; and such vessel, when so chartered, shall be liable in the same manner as if navigated by the owner thereof."

3. The barges were each 240 feet long by 40 feet wide.

4. See Knight, Modern Seamanship (8th Ed.) pp. 337–342.

which compose this litigation. The other proceeding [5] was filed by the owner of these vessels on April 11, 1951. In neither proceeding was the Jane Smith or the barges surrendered to a trustee appointed by the court, nor was a deposit or interim stipulation filed as required by the Limitation of Liability Act.[6] It was represented in the pleadings in both petitions that the Jane Smith was a total loss and, consequently, no stipulation was required. It was further represented that if and when the vessel was refloated, a stipulation would be filed at that time covering her value, less refloating costs. The vessel was eventually refloated, and on November 19, 1951, a stipulation in the amount of $25,000 was filed. Prior to the filing of the stipulation, on January 24, 1951, claimants herein moved to dismiss the limitation proceeding filed by the charterer on the ground that the petitioner had failed to comply with the limitation statute in that it had failed either to surrender the vessel to a trustee appointed by the court or to file an interim stipulation covering her value, and that the six months allowed by the statute [7] for compliance therewith had passed.

At the time this motion to dismiss was argued, it was denied. This Court decided to hear all the evidence in the case before making a final determination with respect to the motion. It is now the holding of this Court that the motion is good and should be granted because of failure of petitioner to comply with the limitation statute. 46 U.S.C.A. § 185. At the time the motion was filed, there was no res before the Court, six months had elapsed from the time the first claim was filed and, consequently, petitioner's right to limit no longer existed. Petition of Goulandris, 2 Cir., 140 F.2d 780. Compare Black Diamond Steamship Co. v. Robert Stewart & Sons, Ltd., 336 U.S. 386, 69 S.Ct. 622, 93 L.Ed. 754.

Moreover, although it was represented by the charterer in its petition for limitation that the Jane Smith was a total loss and that no stipulation, however small, was required to preserve the right to limit, it now appears that a lifeboat of the Jane Smith was salved, together with the two barges. Since this was an integrated tow, and the barges and the tug had the same charterer and owner, these barges, or their value, should have been surrendered.[8] It is noted that in obtaining its injunction pursuant to the limitation proceedings, petitioner was careful to include the barges under its protection. In addition, the third party claim of the Jane Smith against the railroad was not surrendered [9] and petitioner has allowed this claim to prescribe. Now the petitioner argues that the claim was worthless, but the allegations in its

---

**5.** Since the owner is exonerated from liability, no determination of the validity of his limitation petition is made herein.

**6.** 46 U.S.C.A. § 185 reads:
· "The vessel owner, within six months after a claimant shall have given to or filed with such owner written notice of claim, may petition a district court of the United States of competent jurisdiction for limitation of liability within the provisions of this chapter and the owner (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the interest of such owner in the vessel and freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title, or (b) at his option shall transfer, for the bene-

fit of claimants, to a trustee to be appointed by the court his interest in the vessel and freight, together with such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title. Upon compliance with the requirements of this section all claims and proceedings against the owner with respect to the matter in question shall cease."

**7.** See Note 6.

**8.** Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663; Standard Dredging Co. v. Kristiansen, 2 Cir., 67 F.2d 548; Short v. The Columbia, 9 Cir., 73 F. 226.

**9.** See Geotechnical Corp. of Delaware v. Pure Oil Co., 5 Cir., 196 F.2d 199, 201.

limitation petition would indicate other-wise.[10]

In spite of the holding that the petition for limitation must be denied for failure to comply with the statute, since the issue of limitation has been fully tried on the merits, this Court will enter its findings thereon, for use in the event an appellate court finds the denial improvident. Thereafter, this Court will proceed to decide the bareboat charterer's liability to the claimants in suit.[11]

### Limitation

■ Various charges of unseaworthiness to which the charterer and his representative were privy [12] have been leveled at the Jane Smith and her tow by the claimants. It is charged that the steering rudder of the Jane Smith was inadequate to control the vessel under tow, that the rudder stock was defective and had sheared from the hull before the casualty in suit. Neither of these charges is proved. The credible evidence demonstrates that the rudder was fully capable of handling the Jane Smith under tow. The evidence also shows that her rudder stock was sheared in refloating the vessel.

Other than the testimony of a disgruntled former employee and a self-educated expert, the only support for claimants' position with reference to the inadequacy of the rudder and the defect of its stock was the failure of the Jane Smith to respond to hard left rudder after her lead barge had struck the east pier of the draw of the bridge and veered the tow to starboard. The force of the collision with the pier and the force of the current on the tow, approaching, as it was, at a 45° angle to its thread, were fully sufficient to overcome the effect of the hard left rudder.

A second charge of unseaworthiness revolves around testimony from two interlopers who say they came aboard the vessel as she was moored at Simmesport. They testified that the wire cable on the Jane Smith, which was to be used in making up the tow, was frayed and obviously unfit for that purpose. The parting of the cable at the time of the casualty is also pointed to by claimants as support for this charge. Again the evidence will not support this charge of unseaworthiness. The evidence shows that the wire cable on the Jane Smith was relatively new, and certainly the collision with the east and west piers of the bridge was easily sufficient to part the cable. In fact, minor collisions with tows usually result in broken lines.

---

10. Allegation 22 of the limitation petition reads as follows:
"The casualty above described was in nowise caused by any fault, neglect, want of care or design on the part of petitioner, or any of its agents, or anyone for whom petitioner may have been responsible, and occurred without their privity or knowledge; and said casualty was the result of, and was caused solely by the failure of the drawspan of the bridge to open promptly as required by law, the absence of fender pilings and other protective works around the draw, and the strong, swift and irregular eddies and currents of the River, over all of which petitioner and its agents had, and could have had, no control, and the effects of which, despite the exercise of all due care and skill, they could not avoid."

11. See Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612, 1927 A.M.C. 402.

12. See 46 U.S.C.A. § 183(a) and (e) which read:
"(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.
* * *
"(e) In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel."

The claimants also charge that the Jane Smith was improperly manned for a trip down the Atchafalaya at high stage of the river. They say that Captain Verret was not experienced in the Jane Smith type of towboat and, therefore, would be of little assistance to Captain Weldon in negotiating the hazards of the treacherous Atchafalaya. The evidence shows that Verret, while not experienced in pusher-type towboats, was nevertheless a veteran towboatman with extensive exposure to this river. He was what is called a posted pilot, having been down the River within thirty days of the incident in suit. He was sent aboard for the trip to advise Captain Weldon, himself an experienced boatman, but new to the Atchafalaya and its vagaries.

The last charge of unseaworthiness revolves around the fact that the fore and aft doors in the watertight bulkheads leading to the engine room spaces on the Jane Smith were allowed to remain open, to the knowledge of the charterer and his representative. This charge is admitted, but this practice was not a proximate cause of the casualty in suit. When the Jane Smith capsized, she was awash over her entire length on her starboard side up to her boat deck. In this position she easily made enough water to cause her to founder and sink. Under the circumstances, and in view of the speed with which the Jane Smith sank, it cannot be said with assurance that the openings in the watertight bulkheads were a precipitating cause of the casualty.

### Exoneration

This casualty was caused by the failure of Captain Weldon and Captain Verret, both experienced masters and both conning the vessel at the time, to keep the tow from striking the bridge. When navigators bring a vessel in collision with a stationary object, a presumption of fault arises [13] and there is nothing in this record which would put that presumption at issue.[14] In fact, all of the evidence supports the presumption. These navigators, instead of holding back in the four to six m. p. h. current until the bridge was opened, allowed the tow to drift down on the closed draw to such an extent that the Jane Smith had to be backed away twice. In backing, the tow got out of line with the draw. Instead of bringing the tow back in line with the draw before making their final approach, these navigators tried to enter the draw on a 45° angle. This was not a mistake of judgment. This was gross negligence, unworthy of experienced seamen. Captain Weldon and Captain Verret were equally at fault, each was 50 per cent. responsible for the casualty.

Decrees accordingly.

13. The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943; The Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; The Granite State, 3 Wall. 310, 70 U.S. 310, 18 L.Ed. 179; Coyle Lines v. United States, 5 Cir., 195 F.2d 737; The Victor, 5 Cir., 153 F.2d 200.

14. See Griffin, Collision § 25.