**HARCON BARGE COMPANY, a corporation, Plaintiff,**

v.

**M/V J. B. CHAUVIN, her engines, tackle, apparel, etc., in rem and Chotin Transportation, Inc., in personam, Defendants.**

No. GC 78–109–S–O.

United States District Court,
N. D. Mississippi,
Greenville Division.

Oct. 18, 1979.

E. Spivey Gault, Lake, Tindall, Hunger & Thackson, Greenville, Miss., for plaintiff.

William G. Beanland, Brunini, Everett, Beanland & Wheeless, Vicksburg, Miss., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

The action sub judice was submitted to this court for decision after a non-jury trial held in Oxford, Mississippi, at the Federal Building on September 20, 1979. The parties have submitted proposed findings of fact and conclusions of law.

On the record in the action, the evidence submitted at trial and the proposed findings of fact and conclusions of law, the court adopts as its own the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. This is an admiralty or maritime claim within the meaning of Rule 9(h), Federal Rules of Civil Procedure, and this court has jurisdiction as to it and jurisdiction over the parties.

2. Plaintiff, Harcon Barge Company, a corporation, is and was at all times relevant hereto, the owner and operator of the Barges PB–0699, PB–1691, PB–0753, PB–0694, AD–8 and HBC–1612, and of the M/V Marie Thompson.

3. Defendant, Chotin Transportation, Inc., is and was at all times relevant hereto, a corporation organized and existing under the laws of the State of Louisiana and the owner and operator of the tank barge CH–3290, and the M/V J. B. Chauvin.

4. On or about April 18, 1978, at approximately 12:50 P.M., the M/V Marie Thompson was southbound approaching the area of Brown's Point, approximately Mile 444.5, on the Lower Mississippi River with a tow consisting of sixteen (16) loaded gravel barges, four deep and four abreast.

5. The M/V J. B. Chauvin was at the same time, northbound on the Lower Mississippi River, likewise approaching the area of Brown's Point. Its tow consisted of 4 loaded tank barges, "strung out" or in tandem, each of which was 54″ wide. The overall length of the entire Chauvin flotilla was approximately 120′. The lead or head barge in the Chauvin's tow was the barge CH–3290.

6. Brown's Point is located in a bend—a "left hand" bend for descending vessels. Immediately upriver from Brown's Point is another bend—a "right hand" bend for descending vessels. The river, at Brown's Point, is approximately 1,500′ wide.

7. As the two vessels approached each other, a radio conversation occurred. At the time of this conversation, the M/V J. B. Chauvin and tow were in the vicinity of Mile 443 or 443.5 (approximately one (1) mile below Brown's Point). According to the pilot on watch on the M/V J. B. Chauvin, Captain Donald Coghlin, at the time of this radio conversation, the M/V Marie Thompson advised that she (the Marie Thompson and tow) was "coming off" Cabin Teele Light (right descending shore, mile 448.9) and "coming over" to Marshall Point Cut-Off Light (left descending shore, approximately mile 446.1). The pilots of both boats agreed to a "one whistle" or port-to-port passage, premised on the express understanding that the M/V J. B. Chauvin and tow would be close to the left descending bank and above the grain elevator facility which is located on the right descending bank (approximately mile 442).

8. This type of a passing agreement—i. e., a port-to-port passing—is normal and customary in that area of the river and can be accomplished without hazard by pilots exercising reasonable care.

9. After this passing agreement was reached, Captain Coghlin continued northbound running full ahead in the slack water under the point (Brown's Point), and close to the left descending channel line as was marked with red buoys.

10. When the Chauvin reached the area of Brown's Point, the M/V Marie Thompson and tow were in the vicinity of Joseph Henry Light (mile 445.2) proceeding down river at the speed of approximately 10–12 miles per hour and approximately 750′ off the left descending bank/revettment.

11. At that time, the Chauvin was still proceeding full ahead and everything appeared to be normal. Then, the head of the Chauvin's tow proceeded past Brown's Point, leaving the slack water and entering the current. When this occurred, the current caught the head of the Chauvin's tow and began to move it outriver into the path of the descending Marie Thompson's tow.

12. The pilot on the Chauvin attempted to offset the force of the current by steering "hard down" to starboard. At the same time he (the Chauvin's pilot) called the pilot on the Marie Thompson, Lloyd Sanders, and told him that the current had the head of his tow and that he might not be able to control it. Sanders slowed his engines to "slow bell" and began to steer to the starboard—away from the left descending bank and the tow of the M/V J. B. Chauvin in order to give the Chauvin time to get its tow under control. The efforts of the Chauvin's pilot to stop the outriver movement of the head of his tow were unsuccessful and the lead barge in the Chauvin's tow, the tank barge CH–3290, ran up onto the second barge in the Marie Thompson's port string, (the barge PB–0753), capsizing it and then collided with the barge PB–0755, the barge immediately behind the PB–0753, causing the tow of the Thompson to "break up" and the other barges in the Thompson's tow to suffer damages.

13. The pilot on the Chauvin knew that the current at Brown's Point would cause the head of a northbound tow to "sheer" or move outriver if it, the head, was allowed to proceed too far upriver. This pilot admitted that he could have slowed his flotilla and remained well below the Brown's Point. This would have not only given the Thompson flotilla additional navigational room, but would also have insured that the Chauvin's tow would not have been affected by the current at Brown's Point.

14. The court finds as a fact that the navigational maneuvers of the pilot of the Chauvin in proceeding full ahead with that knowledge—and with the certain knowledge of the downbound Marie Thompson—constituted a major statutory fault and gross negligence.

15. At the time of this collision, the M/V Marie Thompson and tow were approximately 750' off the left descending bank—approximately midriver—and essentially parallel to the bank. It was in the normal and customary location for the passing agreement to be consummated without incident. The Chauvin, on the other hand, was virtually, "cross river" with the stern of the boat closer to the left descending bank and the head of the tow some 750' off the left descending bank.

16. The Chauvin's pilot attempts to excuse his negligent navigation by charging that the navigational maneuvers of the M/V Marie Thompson, were improper opinioning that the Thompson should not have made its "crossing" (that is moving from the right descending bank to the left descending bank) from Cabin Teele Light to Marshall Point Cut-Off Light. Rather, the defendants say, due to the river conditions then existing (somewhat high water), the proper navigational course would have been for the Thompson to proceed directly from Cabin Teele Light to Brown's Point—a procedure called "running the point" rather than "steering the bend". In fact, the Chauvin's pilot proceeded past Brown's Point based on that assumption.

17. The court notes, in this regard, however, that the United States Army Corps of Engineers prepares and publishes navigational charts indicating navigational features of the river in this and other areas. On these charts, the Corps of Engineers indicates the approximate location of the channel line—the deepest part of the river—and the recommended "sailing line" or navigational course suggested to river pilots. These maps are—and should be—utilized by competent river pilots in determining the proper navigational course for a specific area of the river.

18. The court notes that in the instant case, Captain Sanders and the Marie Thompson followed the approved, recommended, proper navigational course as shown on the Corps of Engineers navigational map and had no reason to deviate from the course recommended by the Corps—regardless of river condition. The pilot on the Chauvin, on the other hand, did not discuss his "assumption" with the Thompson's pilot, did not check the navigation map and had no idea, in fact, as to how the Marie Thompson intended to make the bend. This pilot, therefore, had no justifiable reason to expect Captain Sanders to navigate in any different manner than was done—and no reason to rely on his "expectations" of a contrary course.

19. Furthermore, had the Chauvin's pilot not allowed the head of his tow to proceed too far up river and get caught in the current, there would have been ample room for the passing to have been accomplished without incident—regardless of the Marie Thompson's course of navigation.

20. The court therefore finds as a fact that the sole proximate cause of the involved casualty was the gross negligence of the Chauvin's pilot in allowing the head of his tow to leave slack water and get caught by the current, causing it to sheer and move outriver, into the tow of the downbound M/V Marie Thompson.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action in admiralty and venue is proper in the Northern District of Mississippi, Greenville Division.

2. Navigation of vessels in the area of this collision is controlled by the statutory rules known as the "Rules of The Road—Western Rivers" (33 U.S.C.A. § 301–356). Particularly applicable in this case is Rule 18(b) [33 U.S.C.A. § 343(b)], which provides, in essence, that the descending vessel—the M/V Marie Thompson—is the "privileged" vessel—i. e., has the "right-of-way". The M/V J. B. Chauvin, as the ascending vessel, is the "burdened" vessel.

3. Thus, once a passing agreement is reached between an ascending and a descending vessel, both vessels are bound to abide by the agreement and navigate their vessels and tows accordingly. Furthermore, the ascending vessel, as the "burdened" vessel, is required to navigate in such a way as to not interfere with the course to be followed by the descending/privileged vessel, and to give the descending vessel the "right-of-way".

4. In this situation, it was the legal responsibility of the M/V J. B. Chauvin's pilot to place his vessel and tow in such a position as to not interfere with the navigation of the downbound M/V Marie Thompson and tow. Implicit in this responsibility is the responsibility of maintaining sufficient control over the tow, to place his tow as close to the left descending bank as necessary to minimize the risk of collision, and to maintain his tow in that posture until the passing was completed.

5. The general rule of admiralty law is that a "sheer" or movement of one vessel into the path of another raises a presumption of negligence on the part of the sheering vessel. It is then the burden of the sheering vessel to rebut the presumption by proving that the cause of the accident in no way resulted from a failure to exercise due care on its part. *Atkins v. Lorentzen*, 328 F.2d 66, (5th Cir., 1964). The Chauvin has failed to meet this burden.

6. Furthermore, and even disregarding any presumptions, under these circumstances, it cannot be disputed that the navigation of the M/V J. B. Chauvin and tow was negligent.

The pilot of the Chauvin proceeded upriver, full ahead, knowing of—but not allowing for—the current and the presence of the downbound (and privileged) M/V Marie Thompson. He allowed—and in fact caused—the head of his tow to sheer outriver in complete violation of the passing agreement previously reached between the two vessels. The Chauvin's pilot was thus guilty of a major statutory fault and, in fact, gross negligence. *Sportmen's Enter-*

*prises, Inc. v. Union Barge Line Corp.*, 306 F.Supp. 1376 (N.D.Miss.1969).

7. Defendants' complaints concerning the navigation of the Marie Thompson (i. e., that its course was improper and was too close to the left descending bank) are not well taken. In analyzing the navigational maneuvers of the Marie Thompson in light of the gross negligence of the J. B. Chauvin, the law is that:

> Where the gross negligence of one vessel is wholly sufficient in itself to account for the collision, and where the active fault of one vessel so flagrantly and heavily outweighs any possible fault or omission of the other vessel, the interests of justice are [better] served by condemning the more culpable vessel completely. (Citations omitted).

*Chotin Transportation, Inc. v. M/V Hugh C. Blaske*, 356 F.Supp. 388, 395 (D.C.La.1972), affirmed 475 F.2d 1370 (5th Cir. 1973).

8. The course chosen by the pilot of the Thompson was a reasonable one as a matter of law in that it was in accordance with the recommendations of the U. S. Army Corps of Engineers and there were no circumstances which would require a reasonably prudent pilot to deviate from the Corps' recommendations. The mere fact that a different course *could* have perhaps safely been taken is, of course, not proof of negligence. *Locke v. River Lines, Inc.*, 248 F.Supp. 92, (N.D.Cal.1964), affirmed 9 Cir., 352 F.2d 307, cert. denied, 383 U.S. 946, 86 S.Ct. 1203, 16 L.Ed.2d 209 (1966).

9. It is also clear that the tow of the Marie Thompson was sufficiently far off the left descending bank to have accomplished the agreed passage without incident, had the J. B. Chauvin not allowed the head of its tow to be caught in the current and moved outriver. Thus, any "fault" on the part of the M/V Marie Thompson did not cause or contribute to this casualty.

10. In conclusion, the court finds that the sole proximate cause of this collision was the negligence of the pilot on the M/V J. B. Chauvin, and plaintiff, Harcon

Barge Company, is entitled to recover its full damages in the amount of Sixty Eight Thousand Six Hundred Seventy Dollars and Eighty Nine Cents ($68,670.89) plus pre-judgment interest at the rate of ten per cent (10%) from April 18, 1978, plus all costs.