## WATER QUALITY INSURANCE SYNDICATE

v.

## UNITED STATES of America.

## Civil Action No. 08–10130–RWZ.

United States District Court,
D. Massachusetts.

June 29, 2009.

John M. Woods, Mary H. Mulhearn, Clyde & Co U.S. LLP, New York, NY, Timothy R. McHugh, Southborough, MA, for Water Quality Insurance Syndicate.

Stephen R. Campbell, U.S. Department of Justice, Washington, DC, for United States of America.

*MEMORANDUM AND ORDER*

ZOBEL, District Judge.

Plaintiff Water Quality Insurance Syndicate ("WQIS") seeks judicial review under the Administrative Procedures Act, 5 U.S.C. § 551 *et seq.* ("APA"), of the final agency action by the United States Coast Guard National Pollution Funds Center ("NPFC"). The NPFC denied plaintiff's claim under the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq.* ("OPA"), for reimbursement of damages and removal costs incurred in connection with an oil spill in Massachusetts Bay on September 6, 2003. Both parties have moved for summary judgment based on the administrative record.

## I. Legal Standard

The standard for reviewing the NPFC's decision is defined by section 706(2)(A) of the APA, which provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse or discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). As the Supreme Court recently explained,

> Under what we have called this "narrow" standard of review, we insist that an agency examine the relevant data and articulate a satisfactory explanation for its action. We have made clear, however, that a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*F.C.C. v. Fox Television Stations, Inc.,* —— U.S. ——, 129 S.Ct. 1800, 1810, 173 L.Ed.2d 738 (2009) (internal quotation marks and citations omitted). "Accordingly, our review under section 706(2)(A) is highly deferential, and the agency's actions

are presumed to be valid." *River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir.2009) (noting that agency's decision must be affirmed if it has a rational basis).

## II. Background [1]

On September 6, 2003, at approximately 6:00 p.m., the Tug VICTORIA ROSE HUNT ("Tug") capsized in the Massachusetts Bay three nautical miles southeast off the coast of Massachusetts. The Tug sank during an attempt to move an anchor belonging to the non-self propelled dredge barge SEI 03 (the "Anchor"). Though the Tug had successfully raised the lighter anchors of another dredge earlier that day, it was not successful in raising the Anchor despite repeated efforts.

Captain Thomas K. Toolis ("Toolis") was the master of the Tug. He had not worked at sea for over three years prior to the day of the capsizing and had never previously worked on the Tug. He had no experience with some of the Tug's apparatus, including a roller guide in a "cage design" which was used to guide lines from the water to the winch. (Administrative Record (Docket # 6) ("A.R.") 019–021.) He had been hired by the owner ("Hunt") the day before and first arrived at the Tug at approximately 8:30 p.m. on September 5, 2003. That evening Toolis and Hunt spent approximately three hours going over the Tug and its equipment. Hunt left around 11:30 p.m., and Toolis slept on the Tug from approximately midnight until 4:30 a.m.

On September 6, 2003, after Toolis awoke at 4:30 a.m. he worked on the Tug in preparation for getting underway. The Tug left the dock around 5:15 a.m. to go to the barge EXCALIBUR. Toolis, Engineer Edward Adams and deckhand Daniel Masterson were aboard. Around 8:30 a.m. the Tug began assisting the EXCALIBUR to move to a work location off Beverly, Massachusetts. They arrived there around 10:30 that morning. At the work site the Tug helped raise and move the EXCALIBUR's anchors, which Toolis was told weighed about 5,000 pounds each. This work ended at approximately 2:30 p.m., and Toolis took a nap while the Tug proceeded to the SEI 03 barge, and arrived at around 4:00 p.m.

During its work with the SEI 03, the Tug was asked to raise the starboard bow anchor of the SEI 03 (the Anchor). The Anchor's weight was (and is) unknown, although Toolis stated that he was told by Hunt and either the SEI 03's captain or winch operator that it weighed 10,000 pounds. A spokesperson for Hunt subsequently told the *Boston Globe* that it weighed 14,000 pounds. In any event, it was at least twice the weight of the EXCALIBUR's anchors. The Tug hooked onto the Anchor at approximately 4:30 p.m. Using the full power of both of the Tug's engines, Toolis was able to pull the Anchor free and started dragging it along the bottom. Toolis called the SEI 03 and advised that the Anchor was free and had been moved. The SEI 03 told Toolis that it did not want him to drag the Anchor.[2] At that point Toolis called Hunt to discuss

1. The facts are drawn from the Administrative Record and the portions of the parties' Statements of Material Facts which are undisputed.

2. There is contradictory evidence on this point. Toolis stated that the SEI 03 originally advised that it didn't want the Anchor

dragged, but subsequently asked the Tug to drag the Anchor a couple hundred yards (*see* A.R. 032). In contrast, the captain of the SEI 03 stated that he notified Toolis not to drag the Anchor at all (*see* A.R. 304). The NPFC concluded that Toolis was told not to drag the Anchor.

how to lift the Anchor. They decided to take more wire off the winch and increase the hydraulic pressure to it. After a detour of approximately an hour to help move the barge, the Tug returned to the Anchor. (A.R. 033–34.) Toolis made the changes he had discussed with Hunt and again tried to lift the Anchor, to no avail. Toolis paid off more cable and gave the Tug's engines more throttle. The wire was on the starboard side of the stern cage, which pulled the Tug starboard. At that point, the Tug rolled to the starboard side about five or ten degrees and became partially submerged at the stern.[3] The water had come through the Tug's scuppers and up against its wheel house.

The Tug started to correct itself but quickly rolled again, more violently, to the starboard side with its throttles still in the ahead position. At around 6:00 p.m., it flipped completely onto its starboard side and sank in over 100 feet of water. It contained around 8,000 gallons of fuel oil and an unknown quantity of other pollutants at the time it sank. Although some of the oil escaped, a large portion remained aboard. The Tug was salvaged approximately one and one-half months later.

WQIS, the Tug's insurer, paid for the cleanup of the oil spill and the salvage. In October 2005 it filed a claim for partial reimbursement with the NPFC for $492,233.68, the amount it expended above the $500,000 limitation of liability amount set out in the OPA. The NPFC denied the claim and the request for reconsideration. The denial of reconsideration constitutes the final agency action.[4]

## III. Discussion

### A. The OPA

In 1989, the supertanker EXXON VALDEZ ran aground in Alaska, causing the largest oil spill in United States history. Congress responded by enacting the OPA, which establishes a comprehensive federal scheme for oil pollution liability. The OPA imposes strict liability for pollution removal costs and damages on the "responsible party" for a vessel or a facility from which oil is discharged. *See* 33 U.S.C. § 2702(a). Responsible parties include owners, operators, or demise charterers of a vessel. *See id.* § 2701(32). The OPA limits the liability of responsible parties based upon the type of vessel and its tonnage. The parties agree that under this provision liability for the Tug is limited to $500,000. *Id.* § 2704(a)(2). However, the OPA also provides that the limitation to liability

> . . . does not apply if the incident was proximately caused by—
>
> (A) gross negligence or willful misconduct of, or
>
> (B) the violation of an applicable Federal safety, construction, or operating regulation by,

---

**3.** The NPFC found that the Tug submerged its stern. Toolis admitted that the Tug had taken on "maybe a foot of water" (A.R. 274) but stated in his supplemental affidavit that the stern was never brought under water. (A.R. 335, ¶ 14.) However, the United States recounts in its statement of material facts that Toolis "left the winch and [Tug] throttles engaged despite submerging the stern of his vessel" (Docket # 12, 11), and WQIS avers that it "does not dispute the material facts presented by the Government, only its conclusions based on those facts." (Docket # 15, 2.)

**4.** Under 33 C.F.R. § 136.115(d), the NPFC has 90 days from the date it receives a request for reconsideration to either deny or grant the request. Plaintiff filed suit after the 90 days had elapsed, and the NPFC denied the request for reconsideration shortly thereafter. Plaintiff does not suggest that the subsequent denial should be disregarded because it was issued after the 90 days had elapsed.

the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party. . . .

*Id.* § 2704(c)(1).

### B. The Administrative Agency Decision

The NPFC's denial of plaintiff's claim rests on two grounds. First, it found that the evidence established a violation of federal safety regulation 46 C.F.R. § 15.405, which requires ship personnel to be familiar with the characteristics of the vessel prior to assuming duties. Second, it found that the capsizing was caused by Toolis' gross negligence. Plaintiff challenges both of these grounds. Under the statute, either ground provides an adequate basis for denying the limitation of liability. *See* 33 U.S.C. § 2704(c)(1). I conclude that the finding of gross negligence was not arbitrary or capricious and, accordingly, do not consider the alternative basis supplied by the NPFC.

 The parties agree that the standard for gross negligence is set forth in *Kuroshima Shipping S.A. Act of God Defense and Limit of Liability Analysis,* 2003 AMC 1681, 1693 (2003):

Negligence is a failure to exercise the degree of care, which a person of ordinary caution and prudence would exercise under the circumstances. A greater degree of care is required when the circumstances present a greater apparent risk. Negligence is "gross" when there is an extreme departure from the care required under the circumstances or a failure to exercise even slight care.

In its initial decision the NPFC set forth several factors supporting its conclusion that "[t]he manner in which Captain Toolis raised the anchor of the barge was an extreme departure from the standard of due care that a prudent mariner would exercise under the same or similar circumstances." (A.R. 237.) First, Toolis was unaware of the exact weight of the Anchor and did not know the capabilities of the Tug's engines and equipment. Second, he had "no experience with the type of roller guide/fair lead mechanism that was installed on the vessel's stern," and this unfamiliarity with the equipment led to his "failure to recognize the problems that the design of the roller guide posed to the stability of the vessel." (A.R. 237–38.)[5] Third, Toolis "dragged the anchor even though he was specifically directed not to by the winch operator, and even though the project was near a national gas pipeline." (A.R. 238.) Fourth, although Toolis sought Hunt's advice and assistance, he nonetheless persisted in his attempts to raise the Anchor even after Hunt's suggestions proved unsuccessful. Fifth, Toolis failed to contact the winch operator before attempting to lift the Anchor as required, and in fact there was not a winch operator

---

5. As the NPFC reviewer explained,

 With regard to the towing configuration modification, Captain Toolis stated, that prior to going aboard the Tug Victoria Rose Hunt he had never seen a roller guide with that particular design. The key difference between that guide and other guides was that this guide was located significantly higher above the waterline counter [to] what he had experienced with others which were located as close to the waterline as possible. Additionally, this modified guide allowed the winch cable to drift from port to starboard off of centerline. The evidence presented in this case is sufficient to find that the guides caused the instability of the vessel when Toolis attempted to raise the anchors from the bottom of the waterway, because they affected the stability of the Tug, by raising its center of gravity. The location of the guide made it more difficult to control the wire that raises and lowers the anchors.

 (A.R. 238–39.)

on the SEI 03 during the second attempt because of a shift change. Sixth, Toolis failed to recognize the significance of the stern of the Tug becoming submerged the first time. Although the Tug was initially able to right itself, Toolis left the winch and throttles engaged, causing the Tug to submerge again to the point where a capsize could not be prevented. The NPFC examiner also noted that Toolis had violated a federal safety regulation which forbids working more than 12 hours in a 24-hour period. Although the examiner recognized that the capsizing may not have been proximately caused by this violation, it noted that the violation provided further support for the conclusion that Toolis' behavior was an extreme departure from the standard of due care that a prudent mariner would exercise.

In its request for reconsideration, WQIS argued that the NPFC's decision was flawed in several respects. First, it asserted that the NPFC had applied the wrong burden of proof and that it was the NPFC's burden to prove Toolis acted with gross negligence. (*See* A.R. 329–30, 330 n. 19.) Second, it believed that the NPFC had based its denial on a mistaken belief that the anchor the Tug was attempting to lift was its own anchor instead of the SEI 03's anchor. Third, WQIS disputed the NPFC's conclusion that Toolis was unfamiliar with the Tug, noting that Toolis had been given a three-hour tour the night before the capsizing. Fourth, based upon a supplemental affidavit submitted by Toolis, WQIS argued that there was "only one likely explanation for the sinking of the Tug," which was that the Anchor was "under tension from the Barge's winch." (A.R. 328.) WQIS argued that in any event a correct application of the legal standard to the facts would lead to a conclusion that Toolis' behavior was not negligent, much less grossly negligent. Finally, WQIS disputed that Toolis had violated the safety

regulation because it asserted that the regulation only forbade a mariner from being "on watch" for more than 12 hours in a 24-hour period, and Toolis had only been "on watch" for approximately ten hours at the time of the sinking. (A.R. 331, 336 (Toolis Aff. ¶ 19.))

The NPFC denied the request for reconsideration. It rehearsed its previous reasoning and reiterated that the record supported a finding of gross negligence by Toolis. The decision specifically noted that Toolis was "unaware of the exact weight of [the] anchor (*of dredge barge No. 3* ) that it was attempting to lift. . . ." (A.R. 427 (emphasis added).) The NPFC also reiterated its finding that Toolis had worked in excess of 12 hours in a 24-hour period, which "adds emphasis to our finding of gross negligence." (A.R. 428.)

### C. Plaintiff's Challenge

■ "The party challenging an agency's action as arbitrary and capricious bears the burden of proof." *City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261, 271 (D.C.Cir.2002) (internal quotation marks and citations omitted). Plaintiff challenges the NPFC's denial of limitation of liability on largely the same grounds asserted in its request for reconsideration.

■ Plaintiff argues that the NPFC applied the wrong burden of proof to its claim because there is a "presumption" that it is entitled to the limitation of liability. According to plaintiff, it is the United States which bears the burden of proving that one of the exceptions listed in § 2704 applies. However, the plain language of the statute provides otherwise. Under § 2708,

> [t]he responsible party for a vessel or facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, may assert a claim for

removal costs and damages under section 2713 of this title *only if the responsible party demonstrates that—* ... the responsible party is entitled to a limitation of liability under section 2704 of this title.

33 U.S.C. § 2708(a)(2) (emphasis added). Accordingly, it is plaintiff, not the United States, which must "demonstrate" that it is "entitled to a limitation of liability." *See Carcieri v. Salazar*, ── U.S. ──, 129 S.Ct. 1058, 1066–67, 172 L.Ed.2d 791 (2009) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there") (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)).[6]

■ Plaintiff next argues that the denial was based upon the NPFC's mistaken belief that the Tug capsized while attempting to pick up its own anchor instead of the SEI 03 barge's anchor. According to plaintiff, this factual error sounds a death knell for the NPFC's conclusion that Toolis violated 46 C.F.R. 15.405, the safety regulation relating to familiarity with the vessel. I agree that the sections discussing 46 C.F.R. 15.405 are not models of clarity and can be read to suggest that the examiner faulted Toolis for his unfamiliarity with the Tug's anchor, even though the Tug's anchor had nothing to do with the incident. However, even assuming *arguendo* that the NPFC erred in its conclusion that Toolis violated 46 C.F.R. 15.405, this error is harmless. *See Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 61 (1st Cir.2001) ("[t]he doctrine of harmless error is as much a part of judicial review of administrative action as of appellate review of trial court judgments"). The remainder of the decisions, particularly those sections discussing gross negligence, clearly indicate that the examiner understood that the capsizing occurred during an attempt to lift the barge anchor. *See Fox Television*, 129 S.Ct. at 1810 (court should uphold decision of "less than ideal clarity" so long as "agency's path may be reasonably discerned").

■ Plaintiff next challenges the NPFC's conclusion that Toolis was grossly negligent. The NPFC identified the following facts, which are supported by the record: Captain Toolis had not worked at sea during the three years prior to the day the Tug capsized; he had been hired the night before and had never been on the Tug prior to that day; he had no previous experience or familiarity with the "cage design" of the roller guide prior to that day and failed to appreciate its effect on the Tug's stability; he was unaware of both the weight of the Anchor and the Tug's capabilities; he failed to contact the SEI 03's winch operator to insure its brake was released; he nonetheless per-

---

6. This interpretation is also consistent with the legislative history of the OPA. *See Apex Oil Co., Inc. v. United States*, 208 F.Supp.2d 642, 651–52 (E.D.La.2002):

[In enacting the OPA] Congress explicitly recognized that the existing federal and state laws provided inadequate cleanup and damage remedies, required large taxpayer subsidies for costly cleanup activities, and presented substantial barriers to victims' recoveries such as legal defenses, corporate forms, and burdens of proof unfairly favoring those responsible for the spills. *See* S.Rep. No. 94, 101st Cong., 1st Sess.

(1989); 1990 U.S.C.C.A.N. 722. Congress also recognized that, pre-OPA, the costs of cleanup and damage from spills were not high enough to encourage greater industry efforts to prevent spills and develop effective techniques to contain spills that did in fact occur. *Id.* Congressional intention is manifestly that the new law would effect compensation to victims, quick and efficient cleanup with minimization of damages to natural resources, and the internalization of the costs of oil spills within the oil industry. *Id.*

sisted in his efforts to raise the Anchor in the face of repeated failures and dangerous listing of the Tug; and he left the winch and Tug throttles engaged despite the Tug's stern becoming submerged.

The NPFC's conclusion that Toolis had been working for more than 12 hours out of a 24–hour period is also adequately supported by the record. The regulation at issue, 46 C.F.R. § 15.705(d), permits an individual operating a towing vessel "to work not more than 12 hours in a consecutive 24 hour period except in an emergency." The regulations do not define "work;" however, in its decision the NPFC cited 46 C.F.R. § 15.1101, which defines "rest" as "a period of time during which the person concerned is off duty, is not performing work (which includes administrative tasks such as chart corrections or preparation of port entry documents) and is allowed to sleep without being interrupted." (A.R. 425.) The record shows that Toolis arrived at the Tug around 8:30 p.m. on September 5, 2003, and spent approximately three hours with Hunt going over the Tug. He awoke around 4:30 a.m. the next morning and "cleaned the deck and made sure everything was there, picked up some lines, straighten[ed] things out." (A.R. 023.) The Tug left the dock at 5:15 a.m. (*see id.*), and from that point forward Toolis operated the Tug until 2:30 p.m., when he took a nap. The NPFC concluded that Toolis worked from 4:30 a.m. until 2:30 p.m., which is ten hours. He awoke at 4:00 p.m. and worked an additional two hours, until the Tug capsized shortly after 6:00 p.m. In sum, the NPFC concluded that Toolis worked three hours the night before and twelve hours the day of the capsizing, for a total of fifteen hours within a consecutive 24–hour period. (*See* A.R. 238 (finding that Toolis "had exceeded the regulated workhours [*sic*] by three hours").) WQIS concedes that Toolis worked from 4:30 a.m. until 6:00 a.m., but

argues that he did not work during the period from 6:00 a.m. to 8:30 a.m. when the Tug was waiting for the EXCALIBUR to be ready to lift anchor. (*See* Docket # 15, 13–14; *see also* A.R. 331 (WQIS's request for reconsideration, in which it asserts that Toolis "only worked from 8:30 a.m. until about 14:30").) Assuming *arguendo* that WQIS is correct, this only subtracts two and a half hours from the tally; Toolis would still have worked 12.5 hours in a 24–hour period in violation of the regulation.

When all of the circumstances recounted above are considered there is a rational connection between the facts and the NPFC's conclusion that Toolis acted with gross negligence. In other words, the conclusion is "supported by a rational basis," and therefore must be affirmed. *See River Street Donuts*, 558 F.3d at 114. Although the standard of gross negligence is not widely discussed in maritime jurisprudence, the NPFC's application of the standard to the facts in this case is consistent with precedent. *See In re Oil Transp. Co.*, 178 F.Supp. 48, 53 (E.D.La.1959) (gross negligence where tug, after two attempts to pass under a bridge before the drawspan was opened, made a third attempt with its tow line out of order and collided with the bridge; captains found grossly negligent for allowing tow to continue to drift towards the drawbridge despite failure to receive response from drawbridge operator); *Harcon Barge Co. v. M/V J.B. Chauvin*, 487 F.Supp. 187 (N.D.Miss.1979) (finding gross negligence where river current which caused tow to turn and collide with another boat was or should have been well-known). It is not this court's role to substitute its judgment for that of the NPFC. *See Fox Television*, 129 S.Ct. at 1810.

WQIS argues that the NPFC "overlook[ed] the more likely proximate cause" of the capsizing because it did not credit

Toolis' supplemental affidavit, which was submitted in connection with the WQIS' request for reconsideration. However, the affidavit is sheer speculation. Toolis states that he is "not certain why the Tug sank," but "think[s]" that "there is only one likely reason for the sinking." He "believe[s] that the Barge Captain and Winch Operator never released tension to the starboard anchor," and "as a consequence, when the Tug attempted to lift the starboard anchor, it was affected by resistance not only from the weight of the starboard anchor, but also from the tension on the port forward, the starboard aft and the port aft anchors as well." (A.R. 335–36.) However, Toolis' "belief" is unsupported by any of the evidence in the record, including the statement he made immediately after the Tug capsized.

Plaintiff also argues that the NPFC's finding of gross negligence is undermined by the fact that the Coast Guard investigated the incident and did not make a finding of negligence or gross negligence by Toolis. However, this fact was never presented to the NPFC, and evidence of action that the Coast Guard may or may not have taken as a result of its investigation is not part of the administrative record. *See Olsen v. United States*, 414 F.3d 144, 155 (1st Cir.2005) ("The Supreme Court has consistently stated that review of administrative decisions is 'ordinarily limited to consideration of the decision of the agency ... and of the evidence on which it was based'") (quoting *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963)).

## IV. Conclusion

The NPFC's conclusion that Toolis acted with gross negligence was rationally connected to the facts, and its decision to deny limitation of liability on this ground is not arbitrary or capricious. The government's motion for summary judgment (Docket # 11) is ALLOWED, and plaintiff's motion for summary judgment (Docket # 13) is DENIED.